**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO.: 1:20-cv-21525-UU**

EL NOVILLO RESTAURANT d/b/a DJJ
RESTAURANT CORP. and EL NOVILLO
RESTAURANT d/b/a TRIAD RESTAURANT
CORP., on behalf of themselves and all others
similarly situated,

        Plaintiffs,

v.

CERTAIN UNDERWRITERS AT LLOYD'S
LONDON, and UNDERWRITERS AT LLOYD'S
LONDON KNOWN AS SYNDICATE XLC 2003,
AFB 2623, AFB2623, AFB 263, BRT 2987,
BRT2988, WRB 1967, and MSP 318,

        Defendants.

_____/

## DEFENDANTS CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY NOS. 773TA10063 AND 773TA10064'S MOTION TO DISMISS THE COMPLAINT AND INCORPORATED MEMORANDUM OF LAW
### INTRODUCTION

       Plaintiffs in this putative class action, "El Novillo Restaurant d/b/a DJJ Restaurant Corp."

and "El Novillo Restaurant d/b/a Triad Restaurant Corp." (collectively, "Plaintiffs"), seek

insurance coverage for business interruption related to the COVID-19 pandemic from Defendants

Certain Underwriters at Lloyd's, London Subscribing to Policy Nos. 773TA1006 and

773TA10064 (misidentified in this action as "Certain Underwriters at Lloyd's London, and

Underwriters at Lloyd's London known as syndicate XLC 2003, AFB 2623, AFB2623, AFB 263,

BRT 2987, BRT2988, WRB 1967, and MSP 318) ("Underwriters").

       Plaintiffs' Complaint must be dismissed for several reasons:

CASE NO.: 1:20-cv-21525-UU

(1) The insurance policies at issue are Commercial Property policies that insure Plaintiffs' properties against direct physical loss or damage.  The policies do provide "Business Income" coverage, but in order for that coverage to apply, consistent with the property coverage being provided, there must be direct physical loss or damage to the insured properties.  Plaintiffs' Complaint fails to sufficiently allege that fundamental predicate, nor under the circumstances alleged could it ever.

(2)  The policies also provide Business Income coverage if a civil authority prohibits access to insured property because of direct physical damage to nearby property. Again, Plaintiffs fail to allege the requisite direct physical damage to nearby property or that access to the insured properties has been prohibited because of such direct physical damage.

(3) Even if the policies' requirements discussed above had been met, coverage is barred by the microorganism exclusion, which excludes coverage for any claim arising directly or indirectly out of a microorganism. The Coronavirus is unquestionably a microorganism.

(4) Similarly, the policies contain pollution exclusions, which preclude coverage for any claim related to substances that pose a threat to human health. Here, Plaintiffs' insurance claim arises out of the Coronavirus, which poses a threat to human health.

(5) Plaintiffs' Complaint, on its face, fails to meet Plaintiffs' burden as Class Plaintiffs under the typicality requirement of Federal Rule of Civil Procedure 23(a) and the predominance inquiry of Federal Rule of Civil Procedure 23(b).

Accordingly, Underwriters' Motion to Dismiss should be granted.

FIELDS HOWELL LLP | 9155 SO. DADELAND BLVD. | SUITE 1012| MIAMI, FL 33156| T: 786-870-5600 | F: 855-802-5821

# I.    FACTUAL BACKGROUND

## A.    THE POLICIES

DJJ Restaurant Corp. ("DJJ") owns and operates a restaurant named "El Novillo Restaurant" in Hialeah, Florida. Triad Restaurant Corp. ("Triad") owns and operates a restaurant in Miami, Florida, also named "El Novillo Restaurant." Collectively, the two El Novillo Restaurants will be referred to as the "Properties."

Underwriters subscribed to two policies that insure the properties on which the restaurants are located. Policy No. 773TA10063, issued to DJJ (the "DJJ Policy"), provides coverage for direct physical loss of or damage, for the property located at 15450 New Barn Road, Hialeah, Florida 33014,[1] effective for the policy period of July 1, 2019, to July 1, 2020. (Exhibit A).[2]  Policy No. 773TA10064, issued to Triad (the "Triad Policy"), provides coverage for direct physical loss of or damage, for the property located at 6380 Bird Road, Miami, Florida 33155, effective for the policy period of July 1, 2019, to July 1, 2020. (Exhibit B).  Both policies afford nearly identical coverage, with the exception of the applicable limits. As such, the DJJ Policy and the Triad Policy are collectively referred to as the "Policies."

The Policies' insuring clauses provide:

## A.  Coverage

We will pay for direct physical loss of or damage to Covered Property at the Premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

(Policies, Exhibits A and B, Form CP 00 10 10 12, at p. 1 of 16).  "Covered Cause of Loss" is defined in the Policies as "direct physical loss unless the loss is excluded or limited in this policy."

---

[1] The insured property is identified on the Declarations Page of the Policies.
[2] The Policies are attached to the Complaint and reattached here for the Court's convenience.

(Policies, Exhibits A and B, Form CP 10 30 10 12, at p. 1 of 10).  While the Policies do provide coverage for loss of "Business Income," the loss must also arise out of direct physical loss or damage to the insured property as identified in the "declarations" page of the Policies.  With respect to business income, the Policies' "Business Income" coverage states, in part:

**1.  Business Income**

\* \* \*

We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". ***The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations*** and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of such premises.

(Policies, Exhibits A and B, Form CP 00 30 10 12, at p. 1 of 9) (emphasis added).

The Policies also provide coverage for "Extra Expense" which is defined as:

**2.  Extra Expense**

**a.**  Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no ***direct physical loss or damage to property*** caused by or resulting from a Covered Cause of Loss.

(Policies, Exhibits A and B, Form CP 00 30 10 12, at pp. 1-2 of 9) (emphasis added). As noted above, "Business Income" coverage is only provided during the "period of restoration", which is defined as:

… the period of time that:

a.  Begins:

(1)  72 hours after the time of direct physical loss or damage for Business Income Coverage; or

(2)  Immediately after the time of direct physical loss or damage for Extra Expense Coverage;

caused by or resulting from any Covered Cause of Loss at the described premises; and

b.  Ends on the earlier of:

(1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

(2) The date when business is resumed at a new permanent location.

(Policies, Exhibits A and B, Form CP 00 30 10 12, at p. 9 of 9). In other words, the Policies do not provide coverage for business income and extra expense if the loss is caused by something other than direct physical loss or damage resulting from a covered cause of loss.

The Policies provide "Civil Authority" coverage but, and again consistent with the fundamental principle of these property policies, direct physical loss or damage to property is required as the civil authority action must result from damage to property caused by a Covered Cause of Loss:

**a.  Civil Authority**

In this Additional Coverage, Civil Authority, the described premises are premises to which this Coverage Form applies, as shown in the Declarations.

When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

(1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

(2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority Coverage for Business Income will begin 72 hours after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

> Civil Authority Coverage for Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will end:
>
> (1) Four consecutive weeks after the date of that action; or
>
> (2) When your Civil Authority Coverage for Business Income ends;
>
> whichever is later.

(Policies, Exhibits A and B, Form CP 00 30 10 12, at p. 2 of 9).

The Policies contain an endorsement that modifies the Civil Authority coverage. However, none of those modifications change the basic coverage requirements of direct physical loss or damage to nearby property and a prohibition on access to the insured property because of such damage. The Policies modify the Civil Authority extension as follows:

> The following applies to the Additional Coverage – Civil Authority under the Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form and Extra Expense Coverage Form:
>
> 1. The Additional Coverage – Civil Authority includes a requirement that the described premises are not more than one mile from the damaged property. With respect to described premises located in Florida, such one-mile radius does not apply.
>
> 2. The Additional Coverage – Civil Authority is limited to a coverage period of up to four weeks. With respect to described premises located in Florida, such four-week period is replaced by a three-week period.
>
> 3. Civil Authority coverage is subject to all other provisions of that Additional Coverage.

(Policies, Exhibits A and B, Form CP 01 25 02 12, at p. 2 of 3). Thus, among the requirements to trigger civil authority coverage, damage to property must prohibit access to the Properties.

The Policies contain certain applicable exclusions. Among those exclusions are broad pollution exclusions (Policies, Exhibits A and B, Form NMA2342 and Form CP 10 20 10 12, at p. 4 of 10) and the microorganism exclusion (Policies, Exhibits A and B, Form LMA 5018).

CASE NO.: 1:20-cv-21525-UU

### B.    THE INSURANCE CLAIMS

On April 9, 2020, DJJ and Triad submitted claims seeking recovery for business income loss as a result of local and state orders related to COVID-19[3] (the "Claims"). (Exhibit C, DJJ Notice of Loss; Exhibit D, Triad, Notice of Loss).  That same day, before Underwriters could conduct any investigation into the Claims, Plaintiffs filed this lawsuit.  (Doc. 1, ¶ 17).

According to the Complaint, Plaintiffs have been forced to close their premises and suspend business operations as a result of governmental orders and the COVID-19 pandemic. (*Id.* at ¶ 43). Specifically, Plaintiffs point to governmental orders issued by Miami-Dade County and the State of Florida. (*Id.* at ¶¶ 39-40). Contrary to Plaintiffs' contentions, Plaintiffs have not "been forced to close their premises." (*Id.* at ¶ 43).

On March 16, 2020, Miami-Dade County Mayor Carlos Gimenez issued Emergency Order 02-20, requiring restaurants in Miami-Dade County to be closed to the public for dine-in services between the hours of 11 p.m. and 6 a.m. (*Id.* at ¶ 39; Exhibit E, Miami-Dade County Emergency Order 02-20).[4] During, these hours, however, restaurants were still allowed to operate their kitchens to conduct delivery services. (Exhibit E). This order did not require the closure of restaurants during normal business hours. (*Id.*). Furthermore, janitorial personnel, contractors, and delivery personnel were allowed access to the restaurants during the hours of 11 p.m. and 6 a.m. to continue delivery operations. (*Id.*).

---

[3]  Unless otherwise specified, for ease of reference, COVID-19 and the Coronavirus that causes the disease will be collectively referred to as "COVID-19."

[4]  These government orders are a matter of public record. When ruling on a motion to dismiss, a district court may consider evidence if its authenticity is a matter of public record. *See Myers v. Foremost Ins. Co.*, No. 8:15-CV-1363-MSS-JSS, 2015 WL 12830477, at *3 (M.D. Fla. Oct. 23, 2015) (citing *SFM Holdings, Ltd. v. Banc of Am. Secs., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010)).

FIELDS HOWELL LLP | 9155 SO. DADELAND BLVD. | SUITE 1012| MIAMI, FL 33156|T: 786-870-5600 | F: 855-802-5821

On March 17, 2020, Florida Governor Ron DeSantis issued Executive Order 20-68, which directed restaurants to adhere to social distancing guidelines by limiting the number of patrons allowed within a building and requiring patrons to maintain a six-foot distance. (Doc. 1, ¶ 40; Exhibit F, Florida Executive Order 20-68). This order did not mandate restaurants to close. (Exhibit F).

Also, on March 17, 2020, Mayor Gimenez issued Emergency Order 03-20, which required restaurants to suspend dine-in services but permitted delivery, pick-up, and take-out services. (Doc. 1, ¶ 40; Exhibit G, Miami-Dade County Emergency Order 03-20). This order also specifically allowed employees and other personnel to access these establishments to continue kitchen operations. (Exhibit G). On March 19, 2020, Mayor Gimenez issued executive order 07-20, ordering the closure of non-essential businesses. (Exhibit H, Miami-Dade Emergency order 07-20). Restaurants, however, were deemed to be essential businesses and were permitted to continue operations consistent with Emergency Order 03-20. (*Id.*).

On March 20, 2020, Governor DeSantis issued Executive Order 20-71, requiring restaurants to suspend on-premises food consumption but allowing restaurants to remain operational for delivery and take-out services. (Exhibit I, Florida Executive Order 20-71). This order also expressly allowed employees and other personnel to access the establishments. (*Id.*). Moreover, this order lifted the restrictions on restaurants selling alcohol for consumption off-premises, thereby allowing restaurants to provide alcohol delivery with food purchases. (*Id.*).

All these measures were put in place to promote social distancing and slow the spread of COVID-19 by minimizing contact between residents. (Exhibit E; Exhibit F; Exhibit G; Exhibit H; Exhibit I). These orders were not issued as a result of any "direct physical loss of or damage" to property, as required under the Policies to trigger coverage. Moreover, the orders did not "prohibit

8

access" to the Properties, as they specifically allow employees and other personnel to enter the premises. In fact, Governor DeSantis' April 1, 2020 Executive Order encouraged restaurants to "provide delivery, carry-out or curbside service." (Exhibit J, Florida Executive Order 20-91).

## II.     LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint. *Jacobs v. Tempur-Pedic Int'l., Inc.*, 626 F.3d 1327, 1332-33 (11th Cir. 2010). A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief," but must allege more than "labels and conclusions," "formulaic recitation of the elements of a cause of action," or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Fed. R. Civ. P. 8(a)(2); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Courts are not required to accept the labels and legal conclusions in the complaint as true. *Sinaltrainal v. Coca-Cola Co*., 578 F.3d 1252, 1261 (11th Cir. 2009).

To survive a motion to dismiss, a complaint must contain facts that, when assumed to be true, sufficiently "state a claim to relief that is *plausible on its face.*" *Iqbal*, 556 U.S. at 678 (emphasis added). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.; see also Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002) (explaining that "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal"). A complaint that does not "contain sufficient factual matter, accepted as true, to state a claim . . . plausible on its face" is subject to dismissal. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (citing *Twombly*, 550 U.S. at 570).

Moreover, "when the allegations of the complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558 (citation and quotations omitted).

### III.   <u>ARGUMENT</u>

### A.   **PLAINTIFFS' COMPLAINT FAILS TO ALLEGE DIRECT PHYSICAL LOSS OF OR DAMAGE TO PROPERTY COVERED BY THE POLICIES**

The Complaint contains no plausible allegations that the Properties have suffered "direct physical loss or damage."  The Policies provide coverage for business income losses if such losses are the result of "direct physical loss of or damage to" the Properties. (Policies, Exhibits A and B, Form CP 00 30 10 12, at p. 1 of 9).  Further, business income coverage is only provided during the "period of restoration", which is the time it takes to repair, rebuild or replace the Properties. (Policies, Exhibits A and B, Form CP 00 30 10 12, at p. 9 of 9). Here, there has been no direct physical loss or damage to the Properties, as evidenced by the fact that there is nothing to repair, rebuild or replace at either property.

The plain language of the Policies "requires direct physical loss or damage to the properties in order to trigger payment" for a business income loss. *See Lubell & Rosen LLC v. Sentinel Ins. Co.*, Ltd., No. 0:16-CV-60429-WPD, 2016 WL 8739330, at *4 (S.D. Fla. June 10, 2016). Florida law places the initial burden on an insured seeking to recover under an all-risk policy of proving that a loss occurred.  *See S.O. Beach Corp. v. Great Am. Ins. Co. of New York*, 305 F. Supp. 3d 1359, 1364 (S.D. Fla. 2018), *aff'd*, 791 F. App'x 106 (11th Cir. 2019). An insured's pleading must sufficiently allege that its losses are covered within a policy's insuring agreement. *See Timber Pines Plaza, LLC v. Kinsale Ins. Co.*, 192 F. Supp. 3d 1287, 1293 (M.D.

Fla. 2016). "A complaint that does not 'contain sufficient factual matter, accepted as true, to state a claim ... plausible on its face' is subject to dismissal." *Id*. at 1292 (quoting *Am. Dental Ass'n*, 605 F.3d at 1289).

Accordingly, to recover for business income loss, Plaintiffs must plead and then prove that they sustained damage to property that is covered under their Policies, that the damage was caused by a covered cause of loss, and that there was an interruption to their businesses that was caused by the property damage. *See Dictiomatic, Inc. v. U.S. Fid. & Guar. Co.*, 958 F. Supp. 594, 602 (S.D. Fla. 1997); *cf. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Texpak Grp. N.V.*, 906 So. 2d 300, 302 (Fla. 3d DCA 2005) (holding that business interruption losses are covered "only if 'resulting from' damage or destruction of real or personal property caused by a covered peril.").

In the Complaint, Plaintiffs merely allege that they have "suffered a direct physical loss of and damage to their property due to the suspension of their operations from the global COVID-19 pandemic and the civil authorities' measures." (Doc. 1, ¶ 34). Plaintiffs further allege that "COVID-19 is physically impacting private commercial property in Miami-Dade County." (*Id*. at ¶ 46).

Under the federal rules, pleading the bare elements of a claim is insufficient — Plaintiffs "must include some supporting facts." *N.P.V. Realty Corp. v. Nationwide Mut. Ins. Co*., No. 8:11-CV-1121-T-17TBM, 2011 WL 4948542, at *4 (M.D. Fla. Oct. 17, 2011). Here, Plaintiffs make conclusory allegations that they have suffered direct physical damage, but the Complaint is devoid of any mention of what physical damage occurred, how the physical damage occurred, and when the physical damage occurred. Accordingly, none of Plaintiffs' allegations, even if taken as true, state a plausible claim that Plaintiffs have suffered a "direct physical loss or damage" as required to trigger coverage under the Policies. *See Timber Pines Plaza, LLC v. Kinsale Ins. Co.*, No. 8:15-

11

cv-1821-T-17TBM, 2016 WL 8943313, at *2 (M.D. Fla. Feb. 4, 2016) ("[I]t is not sufficient to plead that the Plaintiff has suffered damages in the form of 'direct physical damage to its property.'").

The phrase "direct physical loss or damage" "must be given its common meaning." *Rockhill Ins. Co. v. Northfield Ins. Co*., 297 F. Supp. 3d 1279, 1286 (M.D. Fla. 2017). This Court has concluded that "[a] direct physical loss 'contemplates an actual change in insured property then in a satisfactory state, occasioned by accident or other fortuitous event directly upon the property causing it to become unsatisfactory for future use or requiring that repairs be made to make it so.'" *Mama Jo's, Inc. v. Sparta Ins. Co.*, No. 17-cv-23362-KMM, 2018 WL 3412974, at *9 (S.D. Fla. June 11, 2018) (quoting *Healthcare Ctr. of Glendale, Inc. v. State Farm Gen. Ins. Co*., 187 Cal. App. 4th 766, 779 (2010)). If the property can be cleaned and restored to its original function, no covered loss has been suffered. *Id.* ("cleaning is not considered direct physical loss"). The relevant inquiry is whether the structure continues to function. Indeed, "[t]he fact that the restaurant needed to be cleaned more frequently does not mean [the plaintiff] suffered a direct physical loss or damage." *Id.* Furthermore, as stated by the oft-cited Couch on Insurance, and as explicitly adopted by this Court:

> The requirement that the loss be "physical," given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.

*Id*. (quoting 10A Couch on Ins. § 148:46 (3d. Ed. West 1998)); *see also Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 235 (3d Cir. 2002) ("In ordinary parlance and widely accepted definition, physical damage to property means 'a distinct, demonstrable, and physical alteration' of its structure.").

12

CASE NO.: 1:20-cv-21525-UU

In the context of a lawsuit seeking injunctive relief against an insurer for business income coverage related to COVID-19, one court already found that the virus does not cause physical loss or damage. Teleconference, Order to Show Cause at 4-5, *Soc. Life Magazine, Inc. v. Sentinel Ins. Co. Ltd.,* No. 20-CV-3311-VEC (S.D.N.Y. May 14, 2020) (Transcript with oral findings attached hereto as Exhibit K). With regard to COVID-19, the court in *Soc. Life Magazine* noted: "It damages lungs. It doesn't damage printing presses." (*Id.* at 4:25-5:4).

Moreover, the Policies only provide coverage for business income losses incurred during the "period of restoration", which begins with the "direct physical loss or damage" and ends on the earlier of "(1) The date when the property at the described premises should be repaired, rebuilt or replaced . . . or (2) The date when business is resumed at a new permanent location." (Policies, Exhibits A and B, Form CP 00 30 10 12, at p. 9 of 9). Thus, it follows that for there to be coverage under the Policies' business income coverage, Plaintiffs' loss must involve some physical damage to covered property that needs to be repaired. As explained by the Southern District of New York, "the words 'repair' and 'replace' contemplate physical damage to the insured premises as opposed to loss of use of it." *Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co*., 17 F. Supp. 3d 323, 332 (S.D.N.Y. 2014) (citing *United Airlines, Inc. v. Ins. Co. of State of Pa.*, 385 F. Supp. 2d 343, 349 (S.D.N.Y. 2005)); *see also Phila. Parking Auth. v. Fed. Ins. Co*., 385 F. Supp. 2d 280, 287 (S.D.N.Y. 2005) ("'Rebuild,' 'repair' and 'replace' all strongly suggest that the damage contemplated by the Policy is physical in nature.").

Any other reading of the Policies to allow recovery for Plaintiffs' Claims would render central contract terms superfluous. Under Florida law, "insurance contracts are construed according to their plain meaning." *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005). Further, "courts must not construe insurance policy provisions in isolation, but

13

instead should read all terms in light of the policy as a whole, with every provision given its full meaning and operative effect." *Office Depot, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 734 F. Supp. 2d 1304, 1314 (S.D. Fla. 2010) (citations omitted). Courts may not "rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." *Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co.*, 711 So. 2d 1135, 1138 (Fla. 1998).

Thus, under the plain language of the Policies, coverage is only afforded for business income loss if that loss is caused by direct physical loss or damage. Here, Plaintiffs' Claims are solely economic in nature and do not relate to any sort of physical damage, and, therefore, are not covered under the Policies. *See Bahama Bay II Condo. Ass'n, Inc v. United Nat'l Ins. Co.*, 374 F. Supp. 3d 1274, 1278 (M.D. Fla. 2019) ("cost of security guards and security fencing…is not property damage, or 'physical loss…' but is an economic loss. There is nothing in the Policy that covers economic loss."); *see also* Exhibit K, Order to Show Cause at 15 ("[T]his kind of business interruption needs some damage to the property . . . this is just not what's covered under these insurance policies.")

Accordingly, Plaintiffs' Complaint does not allege any facts that trigger coverage under the Policies and their claims fail as a matter of law.

## B.     PLAINTIFFS HAVE NOT PLED VALID CIVIL AUTHORITY CLAIMS

The allegations also fail to trigger the Policies' civil authority coverage. In Florida, the "policyholder bears the initial burden of proving that a loss occurred under the insuring agreement during the policy period." *Somethings Fishy Enter., Inc. v. Atl. Cas. Ins. Co.*, 415 F. Supp. 3d 1137, 1142 (S.D. Fla. 2019).  The civil authority coverage requires physical loss or damage to property near the insured property, and further requires that access to the insured property is prohibited

because of that damage.  Plaintiffs' efforts to obtain civil authority coverage fails because (1) they allege no such physical loss or damage, and (2) access to the Properties has never been prohibited.

In the Complaint, Plaintiffs allege that they have suffered undescribed direct physical loss of and damage to their Properties, as a result of measures put in place by the State of Florida and Miami-Dade County. (Doc. 1 ¶ 38). Then, Plaintiffs allege that these orders required the closure of their restaurants.[5] (Doc. 1 ¶ 43). However, these orders did not require the restaurants to close. In fact, Governor DeSantis affirmatively <u>encouraged</u> all restaurants to continue providing take-out, delivery, and curbside services. (*See* Exhibit J).

Plaintiffs argue that the orders of Mayor Gimenez and Governor DeSantis trigger the "additional coverage" under their Policies. (*See* Doc. 1, ¶¶ 39-40, 74(c)). This "additional coverage" presumably refers to the Policies' coverage extension for civil authority.  As noted above, the civil authority coverage requires that "Covered Cause of Loss causes damage to property other than property at the described premises."  A "Covered Cause of Loss" is defined as "direct physical loss."  Accordingly, the first requirement of the civil authority coverage is that there be direct physical loss that causes damage to property other than the insured property.  Next, because of that damage to nearby property, a civil authority must prohibit access to the insured property.  The action of the civil authority must also be "taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage."  (Policies, Exhibits A and B, Form CP 00 30 10 12, at p. 2 of 9).  In other words, because of direct physical loss that causes damage to other property, the civil authority must

---

[5]  Plaintiffs' restaurants were, in fact, open while Plaintiffs represented in pleadings that they were closed.

prohibit access to the insured location because the nearby property damage has created a dangerous condition.  Plaintiffs fail to allege these necessary elements.

The plain language of the Policies makes clear that coverage requires damage to property other than the described premises *and* an order of civil authority, because of the damage, prohibiting access to the insured's property. *See, e.g.*, *Dickie Brennan & Co. v. Lexington Ins. Co.*, 636 F.3d 683, 686-87 (5th Cir. 2011) ("Civil authority coverage is intended to apply to situations where access to an insured's property is prevented or prohibited by an order of civil authority issued as a direct result of physical damage to other premises in the proximity of the insured's property."). As explained above, COVID-19 does not cause physical damage or loss to property, and therefore, Plaintiffs cannot satisfy the conditions of the civil authority coverage extension. Even looking beyond that shortcoming, there are two more reasons why Plaintiffs cannot fulfill the conditions of the civil authority coverage extension: (1) access to the Properties has not been "prohibited;" and (2) the subject government orders were not taken "in response" to damaged property.

First, Plaintiffs' allegations that "as a direct result of the governmental orders and the COVID-19 pandemic, Plaintiffs have been forced to close their premises [and] suspend business operations" is demonstrably false. (Doc. 1, ¶ 40). As previously detailed, Plaintiffs were never required to cease delivery, take-out, or pick-up services. No government order prevented Plaintiffs themselves, or their employees, from entering the Properties, and indeed certain of the orders actually encouraged access. Although Florida courts do not appear to have considered the issue, numerous other courts have recognized that government orders that hamper access to insured property—but do not entirely *prohibit* it— are insufficient to trigger civil authority coverage. *See, e.g.*, *S. Hosp., Inc. v. Zurich Am. Ins. Co.*, 393 F.3d 1137, 1140 (10th Cir. 2004) (upholding denial

16

of hotel operators' claim for lost business income sustained when customers cancelled visits due to order grounding of flights after the 9/11 attacks); *Kean, Miller, Hawthorne, D'Armond McCowan & Jarman, LLP v. Nat'l Fire Ins. Co. of Hartford*, No. 06-770-C, 2007 WL 2489711, at *1 (M.D. La. Aug. 29, 2007) (holding that civil authority provision was not triggered by Louisiana government order prior to Hurricane Katrina advising residents to stay off the streets because advisories did not "prohibit access" to the insured premises); *By Dev. Inc. v. United Fire & Cas. Co.*, No. Civ. 04-5116, 2006 WL 694991, at *6 (D.S.D. Mar. 14, 2006) (finding that road closures after wildfire did not prohibit access to insured's business); *54th Street Partners v. Fid. & Guar. Ins. Co.*, 305 A.2d 67, 67 (N.Y. Super. Ct. App. Div. 2003) (holding that civil authority extension did not apply to insured who made lost business income claim due to city government's diversion of vehicular and pedestrian traffic in the proximity of its restaurant, because access to the restaurant was not denied). Since the civil authority extension requires Plaintiffs to demonstrate that access to their Properties was "prohibited" by civil authority, and Plaintiffs did not make any such allegations (nor indeed could they), the civil authority extension does not apply.

Second, the subject government orders were not issued "in response" to dangerous physical conditions resulting from physical property damage to nearby property. Rather the orders were issued as precautionary measures to prevent the further spread of COVID-19. In such situations, the civil authority extension is not triggered. *See Syufy Enter. v. Home Ins. Co. of Ind.*, No. 94-0756 FMS, 1995 WL 129229 (N.D. Cal. Mar. 21, 1995). As detailed in *Syufy*, after the return of the Rodney King verdict and subsequent riots, the cities of Los Angeles, San Francisco, and Las Vegas imposed dawn-to-dusk curfews. *Id.* at *1. An insured movie theater operator, who ran theaters in all three cities, submitted a business interruption claim because it closed its theaters during these curfew periods. *Id.* The court concluded there was no civil authority coverage because

not only did the civil orders not specifically prohibit individuals from entering the theaters, but the "requisite causal link between damage to adjacent property and denial of access to a Syufy theater [was] absent." *Id.* at *2. In other words, Syufy had closed its theaters as a "direct result of the city-wide curfews," not as a result of adjacent property damage. Furthermore, the court noted that even though the curfews were imposed to "prevent" property damage, they were not the result of the damage itself. *Id.* at *2. Other courts have reached similar conclusions. *See United Airlines, Inc. v. Ins. Co. of State of Pa.*, 385 F. Supp. 2d 343, 353 (S.D.N.Y. 2005) (holding civil authority coverage did not apply to airport's business interruption claim arising from grounding of flights after the 9/11 attacks because the order to ground flights and bar access to the airport was "to prevent further attacks and as a matter of national security," not because of damage to the Pentagon); *City of Chi. v. Factory Mut. Ins. Co.*, No. 02-C-7023, 2004 WL 549447, at *4 (N.D. Ill. Mar. 18, 2004) ("The business interruption . . . was due to the ground stop order imposed by the FAA in order to prevent further terrorist attacks."); *cf. Prime Alliance Grp., Ltd. v. Hartford Fire Ins. Co.*, No. 06-22535-CIV-UNGARO, 2007 WL 9703576, at *4 (S.D. Fla. Oct. 19, 2007) ("[A] plain language reading of this section provides coverage when a peril—such as a windstorm—causes damage to property and, as a result, access to property is precluded by a civil authority order. The order of civil authority cannot in any reasonable manner be construed as a 'peril.'").

Plaintiffs cannot establish that physical damage occurred due to COVID-19, nor can they establish that the government orders, as specified and incorrectly characterized in the Complaint, prohibited access to the Properties. Moreover, these government orders were not taken in response to covered physical damage but were instead preventative measures issued for public health purposes. Accordingly, the Policies' civil authority coverage extension is not triggered.

CASE NO.: 1:20-cv-21525-UU

### C.    COVERAGE IS BARRED BY THE MICROORGANISM EXCLUSION

The Complaint must be dismissed because Plaintiffs' Claims are excluded from coverage by the plain language of the Policies. When resolving insurance coverage disputes, courts "routinely dismiss complaints for failure to state a claim when a review of the insurance policy and the underlying claim for which coverage is sought unambiguously reveals that the underlying claim is not covered." *Cammarota v. Penn-Am. Ins. Co.*, No. 17-CV-21605-Williams, 2017 WL 5956881, at *2 (S.D. Fla. Nov. 13, 2017); *see also Arias-Bonello v. Progressive Select Ins. Co.*, No. 0:17-CV-60897-UU, 2017 WL 7792704, at *5 (S.D. Fla. Aug. 8, 2017) (dismissing putative class member's breach of contract claims because the claims were expressly excluded from the policy); *MJCM, Inc. v. Hartford Cas. Ins. Co.*, No. 8:09-CV-2275-T-17TBM, 2010 WL 1949585, at *7 (M.D. Fla. May 14, 2010) (granting motion to dismiss under Rule 12(b)(6) because underlying lawsuit was not covered under the subject insurance policy).  Here, even if Plaintiffs could demonstrate a claim within the Policies' coverage grants (which they cannot), coverage nonetheless is barred by the Microorganism Exclusion.

The Microorganism Exclusion provides:

This policy does not insure any loss, damage, claim, cost, expense or other sum directly or indirectly arising out of or relating to:

mold, mildew, fungus, spores or other micro-organisms of any type, nature, or description, including but not limited to any substance whose presence poses an actual or potential threat to human health.

This exclusion applies regardless whether there is (i) any physical loss or damage to insured property; (ii) any insured peril or cause, whether or not contributing concurrently or in any sequence; (iii) any loss of use, occupancy, or functionality; or (iv) any action required, including but not limited to repair, replacement, removal, cleanup, abatement, disposal, relocation, or steps taken to address medical or legal concerns.

This exclusion replaces and supersedes any provision in the policy that provides insurance, in whole or in part for these matters.

(Policies, Exhibits A and B, Form LMA 5018). As set forth below, the Coronavirus that causes COVID-19 is a microorganism.  Therefore, the plain language of this exclusion bars Plaintiffs' Claims, which directly or indirectly arise from COVID-19.

Florida law requires that the Microorganism Exclusion be applied as written. *See Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005) ("[I]f a policy provision is clear and unambiguous, it should be enforced according to its terms whether it is a basic policy provision or an exclusionary provision"). Stated differently, when interpreting unambiguous policy terms, "there is no special construction or interpretation required, and the plain language of the policy will be given the meaning it clearly expresses." *Phila Indem. Ins. Co. v. Yachtsman's Inn Condo Ass'n, Inc.*, 595 F. Supp. 2d 1319, 1323 (S.D. Fla. 2009).

The only two jurisdictions to have substantively addressed similar microorganism exclusions, with one being a Florida circuit court, both found the exclusion to be valid and enforceable. *See Certain Underwriters at Lloyd's of London Subscribing to Policy No. SMP 3791 v. Creagh*, 563 F. App'x 209, 211 (3d Cir. 2014) (holding that the district court correctly applied the microorganism exclusion to the plaintiff's claim); *Certain Underwriters at Lloyd's, London Subscribing to Policy No. W15F03160301 v. Houligan's Pub & Club, Inc.*, No. 2017-31808-CICI, 2019 WL 5611557, at *11 (Fla. Cir. Ct. Oct. 24, 2019) (concluding that "the Microorganism Exclusion bars coverage for the claims in this case"). In *Creagh*, the insured's claim arose after a tenant of its building died and the decomposition of the tenant's body damaged his apartment unit. *Creagh*, 563 F. App'x at 209. The United States District Court for the Eastern District of Pennsylvania held that the subject microorganism exclusion applied because the fluids that escaped the tenant's body and contaminated the unit contained bacteria, which are microorganisms. *See Certain Underwriters at Lloyd's London v. Creagh*, No. 12-571, 2013 WL

CASE NO.: 1:20-cv-21525-UU

3213345, at *3 (E.D. Pa. June 26, 2013). The Third Circuit upheld the decision on appeal. *Creagh*, 563 F. App'x at 211.

A Florida circuit court similarly recognized the unambiguous nature and enforceability of microorganism exclusions in the *Houligan's* case. In *Houligan's*, an insured suffered damage when its building was flooded with sewage and waste following a hurricane. *Houligan's*, 2019 WL 5611557, at *1. In applying the microorganism exclusion to the plaintiff's claim, the *Houligan's* court stated:

> For better or worse, the parties bargained for an insurance policy that contains an extremely broad Microorganism Exclusion, one which supersedes and replaces any language in the Policy that might otherwise provide coverage for the loss in question. As noted, the exclusion applies even in the presence of an insured peril or cause that contributes concurrently to the insureds' loss. This Court must apply the Policy in a manner consistent with its plain language. Doing so leads the Court to conclude that the Microorganism Exclusion bars coverage for the claims in this case.

*Id.* at *11. Significantly, the *Houligan's* court looked to the Center for Disease Control's website and dictionary definitions to find that E. Coli and enterococcus, both of which were present in the sewage and waster, are bacteria, and thus, microorganisms that cause an actual or potential threat to human health. *Id.* The decision in *Houligan's* provides a legal roadmap for this Court because COVID-19 is a microorganism that causes an actual or potential threat to human health, and any claim arising out of COVID-19, regardless of whether physical damage occurred, is therefore excluded from coverage.

Secondary sources, like those relied upon by the *Houligan's* court, support a determination that COVID-19 is a microorganism. No less than the foremost U.S. governmental authorities in the fight against COVID-19—the U.S. Department of Health and Human Services, National Institutes of Health and National Institute of Allergy and Infectious Diseases—defined

CASE NO.: 1:20-cv-21525-UU

microorganism as "microscopic organisms, including bacteria, viruses, fungi, plants, and animals."[6] This is consistent with the findings of other governmental agencies.[7] Adding additional support, scientific journals and textbooks also state that viruses are microorganisms.[8] Even non-scientific sources such as Encyclopedia Britannica, for instance, lists the following "major groups of microorganism": bacteria, archaea, fungi, algae, protozoa, and viruses.[9]

As a result, the Microorganism Exclusion unambiguously excludes coverage for the Plaintiffs' Claims.

### D.    COVERAGE IS BARRED BY THE POLLUTION EXCLUSIONS

In addition to the Microorganism Exclusion, the Policies contain two enforceable exclusions barring coverage for contaminants and contamination. First, the Policies contain the Seepage and/or Pollution and/or Contamination Exclusion, which provides:

> SEEPAGE AND/OR POLLUTION AND/OR CONTAMINATION EXCLUSION USA & CANADA
>
> Notwithstanding any provisions to the contrary within the Policy of which this Endorsement forms part (or within any other Endorsement which forms part of this Policy, this Policy does not insure:
>
> (a) any loss, damage, cost or expense, or
>
> (b) any increase in insured loss, damage, cost or expense, or
>
> (c) any loss, damage, cost, expense, fine or penalty, which is incurred, sustained or imposed by order, direction, instructions or request of, or by agreement with, any court, government agency or any public, civil or military authority, or threat thereof, (and whether or not as a result of public or private litigation.)

---

[6]   *Understanding Microbes in Sickness and in Health*, U.S. DEP'T OF HEALTH & HUMAN SERVS., NAT'L INST. OF HEALTH 47 (Jan. 2006) (Attached hereto as Exhibit L).

[7]     *What is a Microorganism?* NAT'L PARK SERV., U.S. DEP'T OF INTERIOR, 2 (April 2014), https://www.nps.gov/common/uploads/teachers/lessonplans/What%20is%20a%20Microorganism%20Activity%20 Guide2.pdf (listing viruses as one of the five categories of microorganisms).

[8]   *See, e.g.*, Wendy Keenleyside, MICROBIOLOGY: CANADIAN EDITION, § 1.3 (June 23, 2019) ("Viruses are acellular microorganisms."); Kathryn Nixdorff, et al., *Critical Aspects of Biotechnology in Relation to Proliferation*, 150 NATO SCI. SERIES II: MATHEMATICS PHYSICS & CHEMISTRY, 33, 33 (2004) ("Viruses are microorganisms").

[9]     *See Types of Microorganisms*, ENCYCLOPEDIA BRITANNICA (last visited May 6, 2020), https://www.britannica.com/science/microbiology/Types-of-microorganisms.

which arises from any kind of seepage or any kind of pollution and/or contamination, or threat thereof, whether or not caused by or resulting from a Peril Insured, or from steps or measures taken in connection with the avoidance, prevention, abatement, mitigation, remediation, clean-up or removal of such seepage or pollution and/or contamination or threat thereof.

\* \* \*

The term 'any kind of seepage or any kind of pollution and/or contamination' as used in this Endorsement includes (but not limited to):

(a) seepage of, or pollution and/or contamination by, anything, including but not limited to, any material designated as 'hazardous material' by the United States Environmental Protection Agency or as 'hazardous material' by the United States Department of Transportation, or defined as a 'toxic substance' by the Canadian Environmental Protection Act for the purposes of Part II of that Act, or any substance designated or defined as toxic, dangerous, hazardous or deleterious to persons or the environment under any Federal, State, Provincial, Municipal or other law, ordinance or regulation; and

(b) the presence, existence, or release of anything which endangers or threatens to endanger the health, safety or welfare of persons or the environment.

(Policies, Exhibits A and B, Form NMA2342).[10] The Policies also contain the following exclusion, which states:

> 2. We will not pay for loss or damage caused by or resulting from any of the following:
>
> \* \* \*
>
> l. Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss." But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss."

(Policies, Exhibits A and B, Form CP 10 20 10 12, at p. 4 of 10). The term "pollutant" is defined, in part, as "any solid, liquid gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." (Policies, Exhibits A and B, Form CP 00 10 10

---

[10] Notably, the "pollutant/contamination" exclusion applies "[n]otwithstanding any provision to the contrary" and it does not replace or supersede any similar provisions.

12, at p. 16 of 16). Under the plain language of either of these exclusions (collectively, the "Pollution Exclusions"), and Florida law, coverage for the Claims is excluded.

The Florida Supreme Court has recognized that pollution exclusions extend beyond merely "environmental or industrial pollution." *Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co.*, 711 So. 2d 1135, 1138 (Fla. 1998) (holding that a claim arising from an ammonia spill fell within a pollution exclusion). Instead, the plain language of pollution exclusions should be enforced as written and Florida courts should not "place limitations upon the plain language of a policy exclusion simply because [they] may think it should have been written that way." *Id.* at 1139. This includes the term "contaminant," which the Florida Supreme Court held to be unambiguous. *See id.*

COVID-19 undoubtedly qualifies as a "pollutant" and/or "contamination." The Southern District of Florida has recognized that "living organisms," "microbial populations," "microbial contaminants," and "indoor allergens" fit the ordinary definition of a "contaminant." *Nova Cas. Co. v. Waserstein*, 424 F. Supp. 2d 1325, 1334 (S.D. Fla. 2006). In *Nova*, this Court reasoned that these substances "infected the plaintiffs' bodies or made them impure by contact, thereby fitting the ordinary meaning of a 'contaminant,' and having an effect commonly known as 'contamination.'" *Id.* Relatedly, this Court has enforced a pollution exclusion to exclude coverage for a claim arising from "viral contaminants" and "harmful microbe[s]" found in an insured's swimming pool, from which a guest alleged that he contracted the Coxsackie virus. *See First Specialty Ins. Corp. v. GRS Mgmt. Assocs., Inc.*, No. 08-81356-CIV, 2009 WL 2524613, at *4-5 (S.D. Fla. Aug. 17, 2009); *see also James River Ins. Co. v. Epic Hotel, LLC*, No. 11-CV-24292-UU, 2013 WL 12085984, at *4 (S.D. Fla. Jan. 9, 2013) (applying pollution exclusion to bar coverage for claims arising from Legionnaire bacteria). Other courts have reached analogous

24

conclusions. *See, e.g.*, *U.S. Fire Ins. Co. v. City of Warren*, 87 F. App'x 485, 487, 490 (6th Cir. 2003) (applying a pollution exclusion to sewage water that was alleged to contain "pathogens, carcinogens, and disease carrying organisms including but not limited to HIV viruses, *e. coli* bacteria, hepatitis (all strains), and other bacteria"); *Certain Underwriters at Lloyd's London v. B3, Inc.*, 262 P.3d 397, 400-401 (Okla. Ct. App. 2011) (holding a pollution exclusion applied to claim stemming from contaminated water alleged to contain, among other things, "bacteria (including E. Coli) [and] viruses").

The Policies' definitions of "contamination" and "pollutant" unambiguously encompass COVID-19. Just as this Court reasoned in *Nova*, COVID-19 is a virus that infects peoples' bodies, thereby fitting the ordinary meaning of "contaminant." *Nova Cas. Co.* 424 F. Supp. 2d at 1334.[11] Similarly, under pollution exclusions like the Policies' "pollution exclusion," claims stemming from viruses are precluded from coverage under such exclusions, as demonstrated by this Court's decision in *First Specialty Ins. Corp*. *See* 2009 WL 2524613, at *4-5. COVID-19 has been "designated or defined" as "dangerous" by both Federal and State ordinances or regulations. Indeed, the U.S. Department of Health and Human Services has determined that the "SARS coronavirus" (SARS-CoV), to which COVID-19 is related,[12] is a "biological agent . . . and toxin"

---

[11] To be sure, COVID-19 is a disease caused by the virus SARS-CoV-2. Alexander E. Gorbalenya et al., *The species Severe acute respiratory syndrome-related coronavirus: classifying 2019-nCoV and naming it SARS-CoV-2*, 6 NATURE MICROBIOLOGY 526, 526 (March 2, 2020). Continuing, this Court has repeatedly considered at the motion to dismiss stage secondary sources such as scholarly articles. *See Jones v. Santander Consumer USA Inc.*, No. 16-14012-CIV-ROSENBERG/LYNCH, 2016 WL 11570406, at *3 (S.D. Fla. Aug. 2, 2016) (listing secondary sources that conflict with argument in motion to dismiss); *Dapeer v. Neutrogena Corp.*, 95 F. Supp. 3d 1366, 1371 n. 1 (S.D. Fla. 2015) (incorporating numerous secondary sources cited in Rule 12(b)(6) motion to dismiss); *cf. Aldar Tobacco Grp., LLC v. Am. Cigarette Company, Inc.*, No. 08-62018-CIV-JORDAN, 2010 WL 11601994, at *1 (S.D. Fla. Dec. 29, 2010) (admonishing attorney for citing "zero cases, statutes, codes, or *secondary sources* in his motion to dismiss) (emphasis added). Ultimately, this Court has "complete discretion" to accept material beyond the pleadings when considering a motion to dismiss. *Continental Cas. Co. v. Hardin*, No. 8:16-cv-322-17GW, 2016 WL 11234458, at *11 (M.D. Fla. Dec. 5, 2016).

[12] *See COVID-19, MERS & SARS*, NAT'L INST. OF ALLERGY & INFECTIOUS DISEASES (April 6, 2020), https://www.niaid.nih.gov/diseases-conditions/covid-19; Alping Wu, et al., *Genome Composition & Divergence of*

with "the potential to pose a severe threat to public health and safety." 42 C.F.R. § 73.3(a) & (b) (2017). Moreover, in the subject executive orders issued by Governor DeSantis, the Governor stated that he is "responsible for meeting the *dangers* presented to this state and its people by [COVID-19]." (Exhibit F (emphasis added)); *see also* Exhibit J). Thus, COVID-19 has been defined as dangerous to human health by both the federal government and government of Florida.

Having established that COVID-19 qualifies as a pollutant and/or contaminant under the Policies and Florida law, the Pollution Exclusions clearly apply, given that they exclude coverage for claims "arising from" or "resulting from" pollution and/or contamination. (Policies, Exhibits A and B, Form NMA2342; Form CP 10 20 10 12, at p. 4 of 10). Causation phrases such as these are broadly construed in Florida. *See Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005) (holding that causation phrase "arising out of" is broader than "caused by" as used in an exclusion). Moreover, Plaintiffs assert that their Claims were "a direct result of the governmental orders and the COVID-19 pandemic." (Doc. 1, ¶ 43). Accordingly, the Claims as alleged arose from or resulted from COVID-19 and are excluded from coverage under the Policies.

## E.   PLAINTIFFS' COMPLAINT FAILS TO STATE A CLAIM FOR CLASS RELIEF

Plaintiffs' Complaint fails to state a claim for class relief for two reasons. First, Plaintiffs are not members of the proposed class, as the Policies do contain an exclusion for pandemics (or epidemics), or anything else caused by microorganisms. Second, it is clear on the face of Plaintiffs' Complaint that they do not satisfy Rule 23(b)'s predominance inquiry. Because Plaintiffs'

---

*the Novel Coronavirus (2019-nCov) Originating in China*, Commentary, 27 Cell Host & Microbe 325, 326 (Mar. 11, 2020) ("[T]he 2019-nCov is in the same *Betacoronavirus* clade as MERS-CoV, SARS-like bat CoV, and SARS-CoV.").

CASE NO.: 1:20-cv-21525-UU

Complaint is facially deficient, the Court should consider the legal insufficiencies of its class allegations at this time.

### 1.    This Court Can and Should Consider the Legal Insufficiencies of Plaintiffs' Class Allegations

"[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Bell Atl. v. Twombly*, 550 U.S. 544, 558 (2007) (internal quotation marks omitted). This is especially true for claims for class relief. *Cf. Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 945 (6th Cir. 2011) (affirming the district court's judgment striking class allegations and dismissing a lawsuit prior to discovery, where the issues involved "a largely legal determination" and "no proffered or potential factual development offer[ed] any hope of altering that conclusion."); *accord* Fed. R. Civ. P. 23(c)(1)(A) (a district court must " [a]t an early practicable time after a person sues or is sued as a class representative…determine by order whether to certify the action as a class action"); *Kamm v. California City Dev. Co.*, 509 F.2d 205, 213 (9th Cir. 1975); *DeBord v. Texas CES, Inc.*, No. MO:17-CV-215, 2018 WL 1858234, at *3 (W.D. Tex. Apr. 3, 2018).

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979). To justify departing from that rule, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-49 (2011) (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)); *see also Alonso as Next Friend of I.A. v. Sch. Bd. of Collier Cty., Fla.*, 2018 WL 5304813, at *5 (M.D. Fla. Aug. 8, 2018). This requirement—referred to as "typicality"— is

one of the four requirements that must be fulfilled to demonstrate that class representatives are appropriate.[13] *See* Fed. R. Civ. Pro. 23(a).

Underwriters are aware that some courts may be hesitant to rule on the adequacy of class representation at the motion to dismiss junction. However, Plaintiffs fall blatantly outside of the scope of the class they claim to represent and, as such, fail to satisfy Federal Rule of Civil Procedure 23(a). Even if Plaintiffs did fall within the class they purport to represent, they do not satisfy Rule 23(b)(3)'s predominance inquiry. The Eleventh Circuit has held that under certain circumstances, a court may rule on the propriety of class certification from the face of the complaint. *See Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1006 (11th Cir. 1997). Furthermore, this Court has recognized that class allegations can be properly addressed by motions to dismiss. *Saunders v. BellSouth Advert. & Pub. Corp.*, No. 98-1885-CIV, 1998 WL 1051961, at *1 n. 2 (S.D. Fla. Nov. 10, 1998) (granting motion to dismiss class action because "it seems clear to the Court based on the Complaint that the Plaintiffs' claims do not satisfy the commonality or typicality requirements of Rule 23(a)"). This is one of those circumstances, as Plaintiffs' class allegations are facially deficient. Accordingly, this Court may properly dismiss Plaintiffs' class allegations.

2.  **Plaintiffs Are Not a Part of the Class They Purport to Represent, Failing to Satisfy the Typicality Requirement of Rule 23(a)**

In the Complaint, Plaintiffs define the nationwide class they purport to represent as:

All entities who have entered into *standard* all-risk commercial property insurance policies with the Underwriter Defendants, where such policies provide for business income loss and extra expense coverage *and do not exclude coverage for*

---

[13]   The other three requirements are: numerosity, commonality, and adequate representation. *See* Fed. R. Civ. Pro. 23(a). While Underwriters contest that Plaintiffs satisfy any of these requirements, the failure to satisfy the typicality requirement, as demonstrated below, is evident from the allegations in the Complaint and must be addressed at this stage of the proceedings, rather than during class certification.

*pandemics*, and who have suffered losses due to measures put in place by civil authorities to stop the spread of COVID-19.

(Doc. 1, ¶ 59 (emphasis added)). While Underwriters contest that the Policies provide business income loss and extra expense coverage for the Claims, it is indisputable that the Policies have individual endorsements, making them non-standard, and exclude coverage for pandemics caused by microorganisms.

To argue that the Policies provide "standard" coverage, the Plaintiffs claim "[t]he Underwriter Defendants use standard, uniform insurance policies issued by the Insurance Services Office (ISO)." (*Id.*, ¶ 29). From there, the Complaint references CP 00 10 and CP 00 30 forms. (*Id.*, ¶¶ 30-33). In so doing, Plaintiffs ignore numerous changes made to the Policies through the use of non-standard forms, such as Form SCU-006 1016, which contains seven pages of changes to the "standard" wording. (Policies, Exhibits A and B, Form SCU-006 1016). Among those changes are the Microorganism Exclusion and the Seepage and/or Pollution and/or Contamination Exclusion detailed above. (*Id.*). All told, the Policies are not "standard," and as such, Plaintiffs are not part of their own proposed class.

As noted above, the Policies contain the Pollution Exclusions and the Microorganism Exclusion that apply to viruses such as COVID-19. Even if the Court were to disagree that these exclusions applied here, they surely apply to some pandemics. Plaintiffs' class definition is broadly defined to include entities with policies that do not exclude coverage for "pandemics," meaning that Plaintiffs, by virtue of these exclusions in the Policies, do not meet the parameters of their class definition.

COVID-19 is, of course, not the first or only pandemic.[14] "Pandemic" is defined as "an outbreak of a disease that occurs over a wide geographic area and affects an exceptionally high proportion of the population."[15] Pandemics are, by no means, limited to viral diseases. The Bubonic plague, for example, is a bacterial disease, caused by the "*Yersinia pestis*" bacteria, that is described as a pandemic.[16] Cholera, the world's "longest running pandemic" is another bacterial disease, caused by eating or drinking food or water contaminated with the "*Vibrio cholerae*" bacteria."[17] The Pollution Exclusions preclude coverage for damages caused by contamination, which includes bacterial pandemics. *See Epic Hotel, LLC*, 2013 WL 12085984, at *4 (S.D. Fla. Jan. 9, 2013) (applying pollution exclusion to bar coverage for claims arising from Legionnaire bacteria). Likewise, the Policies' Microorganism Exclusion explicitly excludes coverage for all claims arising from or relating to "microorganisms." (Policies, Exhibits A and B, Form LMA 5018).

The Policies contain exclusions that preclude coverage for pandemics. Therefore, based on the allegations of the Complaint and the plain language of the Policies on which the actions are based, Plaintiffs are not members of the class they defined. As a result, this Court need not wait until the class certification stage to determine that the class allegations in Plaintiffs' Complaint are deficient.

---

[14]   *See, e.g.*, Michael S. Rosenwald, *History's deadliest pandemics, from ancient Rome to modern America*, WASHINGTON POST, (April 7, 2020), https://www.washingtonpost.com/graphics/2020/local/retropolis/coronavirus-deadliest-pandemics/.
[15]   *Pandemic*, MERRIAM-WEBSTER (last accessed May 8, 2020), https://www.merriam-webster.com/dictionary/pandemic.
[16]   *Plague*, CENTER FOR DISEASE CONTROL (last visited May 8, 2020), https://www.cdc.gov/plague/faq/index.html#what; *see Black Death*, ENCYCLOPEDIA BRITANNICA (April 15, 2020), https://www.britannica.com/event/Black-Death ("Black Death, pandemic that ravaged Europe between 1347 and 1351 . . . .").
[17]   *See Cholera*, WORLD HEALTH ORG. (last visited May 8, 2020), https://www.who.int/health-topics/cholera#tab=tab_1; *Cholera: The Forgotten Pandemic*, WORLD HEALTH ORG. (October 22, 2018), https://www.who.int/cholera/the-forgotten-pandemic/en/.

CASE NO.: 1:20-cv-21525-UU

### 3.  Plaintiffs Cannot Satisfy Rule 23(b)(3) as a Matter of Law

Rule 23(b)(3) allows for class certification where the requirements of Rule 23(a) have been satisfied and "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Hammett v. Am. Bankers Ins. Co*., 203 F.R.D. 690, 698 (S.D. Fla. 2001) (quoting Fed. R. Civ. P. 23(b)(3)). The predominance inquiry tests "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id*. (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). To determine whether common issues predominate, the Court must "examine the cause of action asserted in the complaint." *Rutstein v. Avis Rent-A-Car Sys., Inc*., 211 F.3d 1228, 1234 (11th Cir. 2000) (internal citations and quotations omitted). "The predominance inquiry focuses on 'the legal or factual questions that qualify each class member's case as a genuine controversy,' and is 'far more demanding' than Rule 23(a)'s commonality requirement." *Jackson v. Motel 6 Multipurpose, Inc*., 130 F.3d 999, 1005 (11th Cir. 1997) (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)); *see also Powers v. Gov't Employees Ins. Co.*, 192 F.R.D. 313, 318 (S.D. Fla. 1998).

Plaintiffs assert a cause of action, on behalf of themselves and others "similarly situated," for anticipatory repudiation of the Policies and seek a declaratory judgment that their alleged losses are covered under the Polices. This will necessarily require the Court to adjudicate putative class claims under the laws of several states. "Variations in the law applicable to multistate class actions may implicate both predominance and manageability concerns." *James D. Hinson Elec. Contracting Co. v. AT & T Servs., Inc*., No. 3:13-cv-29-J-32JRK, 2014 WL 1118015, at *4 (M.D. Fla. Mar. 20, 2014). In a federal diversity action, a federal court must apply the choice-of-law rules

31

of the forum state. *See LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1515 (11th Cir.1997). As this is a contract interpretation dispute, Florida's choice-of-law rule applies. *See id.* Florida courts "have long adhered to the rule of lex loxi contractus." *State Farm Mut. Auto. Ins. Co. v. Roach,* 945 So. 2d 1160, 1163 (Fla. 2006). Thus, under Florida law, "[i]t is well established . . . that matters bearing on execution, validity, interpretation and obligations of contracts are determined by the law of the place where the contract is made." *Hammett v. Am. Bankers Ins. Co.*, 203 F.R.D. 690, 700 (S.D. Fla. 2001). The determination of where a contract is made "is fact intensive" and "requires a determination of where the last act necessary to complete the contact [w]as done." *Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking, Inc.*, 363 F.3d 1089, 1092-93 (11th Cir. 2004) (quoting *Pastor v. Union Cent. Life Ins. Co.*, 184 F. Supp.2d 1301, 1305 (S.D. Fla. 2002).

Therefore, to determine the law governing each policy, this Court will have to perform a fact-intensive analysis for every policy issued to every putative class member to determine where the last act necessary to complete the contract was performed. That inquiry will be individualized. From there, each proposed class member will be subject to different state, county, and local orders related to COVID-19. Even within the same city block, those orders will apply differently to businesses of different types, i.e. essential versus non-essential businesses. Once these numerous variations are applied, the Court will then have the unenviable task of wading through all the variations in state law to make 50 *Erie* guesses, not counting U.S. territories, where Underwriters subscribed to risks.

This Court's decision in *Hammett v. Am. Bankers Ins. Co.*, 203 F.R.D. 690 (S.D. Fla. 2001) is instructive on this point. In *Hammett*, the plaintiffs filed a class action suit against credit insurers and asserted a claim for breach of contract. *Id.* at 700. This Court found that the plaintiffs failed to

establish predominance, in part, because "[c]onsidering adjudication of Plaintiff's breach of contract claim will require consideration of the laws of many states." *Id.* at 701. Similarly, here, Plaintiffs' anticipatory breach of contract claim will require consideration of the law of many states. In other words, common questions of law and fact among class members do not predominate and thus, Plaintiffs' Complaint does not, and cannot, satisfy Rule 23(b)'s predominance inquiry.

## IV.    CONCLUSION

Plaintiffs have failed to satisfy their burden to plead facts that would give rise to a covered claim or demonstrate that a case or controversy exists. Additionally, Plaintiffs cannot allege facts that sufficiently demonstrate they have suffered direct physical loss of or damage to their Properties. Even if Plaintiffs could allege a covered cause of loss, their claims are unambiguously excluded under the Policies' Pollution and Microorganism Exclusions. Finally, it is apparent on the face of Plaintiffs' complaint they cannot meet the requirements for class certification.

Thus, for the foregoing reasons, Underwriters respectfully request the Court dismiss Plaintiffs' Complaint.

FIELDS HOWELL LLP | 9155 SO. DADELAND BLVD. | SUITE 1012 | MIAMI, FL 33156 | T: 786-870-5600 | F: 855-802-5821

CASE NO.: 1:20-cv-21525-UU

## CERTIFICATE OF SERVICE

I HEREBY CERITFY that the foregoing has been filed this **22nd** day of June, 2020, using the Court's CM/ECF filing system and served via email to: **Harley S. Tropin, Esq., Benjamin Widlanski, Esq., Gail A. McQuilkin, Esq., Javier A. Lopez, Esq., and Robert Neary, Esq.,** KOZYAK TROPIN & THROCKMORTON LLP, Attorneys for Plaintiffs, 2525 Ponce de Leon Blvd., 9th Floor, Coral Gables, FL 33134, hst@kttlaw.com, bwidlanski@kttlaw.com, gam@kttlaw.com, jal@kttlaw.com, rn@kttlaw.com.

FIELDS HOWELL LLP
Attorneys for Defendants, Underwriters
9155 So. Dadeland Blvd.
Suite 1012
Miami, FL 33156
Tel:  (786) 870-5600
Fax: (855) 802-5821

By:*/s/ Armando P. Rubio*
    Armando P. Rubio, Esq.
    Florida Bar No. 478539
    arubio@fieldshowell.com
    service@fieldshowell.com