**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 1:20-cv-21525-UU**

EL NOVILLO RESTAURANT
d/b/a DJJ RESTAURANT CORP.,
and EL NOVILLO RESTAURANT
d/b/a TRIAD RESTAURANT CORP.,
on behalf of themselves and all others
similarly situated,

      Plaintiffs,

v.

CERTAIN UNDERWRITERS AT LLOYD'S
LONDON, and UNDERWRITERS AT
LLOYD'S LONDON KNOWN
AS SYNDICATE XLC 2003, AFB 2623,
AFB 623, BRT 2987, BRT 2988, WRB 1967,
and MSP 318,

      Defendants.
_____/


**PLAINTIFFS' RESPONSE IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 4

ARGUMENT ...................................................................................................................... 9

I. PLAINTIFFS' LOSSES ARE COVERED BY DEFENDANTS' ALL-RISK POLICIES. ....... 9

    A.  Structural Damage Is Not Required to Trigger Coverage for Business Interruption Losses
        Under the Policies. ...................................................................................................... 11

        1.  A "direct physical loss" of property includes a loss of functionality or intended use.  11

        2.  Defendants' cited authority does not require structural damage. ................................. 18

        3.  The definition of "period of restoration" does not limit Plaintiffs' coverage. ............. 20

    B.  Plaintiffs' Losses Are Not Excluded Losses. .................................................................. 23

        1.  The Microorganism Exclusion Cannot Be Read to Deny Coverage. ......................... 24

        2.  The Policies' Pollution Exclusions Cannot Be Read to Deny Coverage. .................... 27

    C.  Plaintiffs Are Entitled to Additional Coverage for Business Income Losses Arising from
        Civil Authority Orders ................................................................................................. 30

II. PLAINTIFFS HAVE STATED CLAIMS ON BEHALF OF A PUTATIVE CLASS. ........... 34

    A.  Plaintiffs' Claims Are Typical of Those of the Proposed Class. ..................................... 36

    B.  Plaintiffs' Class Allegations Satisfy Rule 23(b)(2). ......................................................... 37

    C.  The FAC Does Not Reflect the Predominance of Individual Issues on Its Face. ............... 39

CONCLUSION .................................................................................................................. 40

REQUEST FOR HEARING ............................................................................................... 40

CERTIFICATE OF SERVICE ........................................................................................... 42

## **TABLE OF AUTHORITIES**

### **Cases**

*10th St. Partners, LLC v. Cty. Comm'n ex rel. Sarasota Cnty.*,
   2012 WL 4328655 (M.D. Fla. Sept. 20, 2012) ........................................................... 6

*54th St. Ltd. Partners, L.P. v. Fid. & Guar. Ins. Co.*,
   306 A.D.2d 67 (N.Y. App. Div. 2003) ...................................................................... 32

*Ajax Bldg. Corp. v. Hartford Fire Ins. Co.*,
   358 F.3d 795 (11th Cir. 2004) ................................................................................. 13

*Allstate Ins. Co. v. Preferred Fin. Sols., Inc.*,
   8 F. Supp. 3d 1039 (S.D. Ind. 2014) ....................................................................... 13

*Azalea, Ltd. v. Am. States Ins. Co.*,
   656 So. 2d 600 (Fla. 1st DCA 1995) ................................................................. 14, 19

*Banco Nacional De Nicaragua v. Argonaut Ins. Co.*,
   681 F.2d 1337 (11th Cir. 1982) ............................................................................... 10

*Bartholomew v. Lowe's Home Centers, LLC*,
   2020 WL 1677289 (M.D. Fla. Apr. 6, 2020) ........................................................... 35

*Blue Cross & Blue Shield of Fla., Inc. v. Steck*,
   778 So. 2d 374 (Fla. 2d DCA 2001) ........................................................................ 23

*Bonner v. City of Pritchard*,
   661 F.2d 1206 (11th Cir. 1981) ............................................................................... 15

*Brown v. Travelers Ins. Co.*,
   649 So. 2d 912 (Fla. 4th DCA 1995) ....................................................................... 12

*Burlington Ins. Co. v. Indus. Steel Fabricators, Inc.*,
   387 F. App'x 900 (11th Cir. 2010) ........................................................................... 12

*By Dev., Inc. v. United Fire & Cas. Co.*,
   2006 WL 694991 (D.S.D. Mar. 14, 2006) ............................................................... 32

*Central Int'l Co. v. Kemper Nat'l Ins. Cos.*,
   202 F.3d 372 (1st Cir. 2000) ................................................................................... 13

*Certain Underwriters at Lloyd's London v. Creagh*,
   2013 WL 3213345 (E.D. Pa. June 26, 2013) ..................................................... 26, 27

*Certain Underwriters at Lloyds of London Subscribing
to Policy No. SMP3791 v. Creagh*,
   563 F. App'x 209 (3d Cir. 2014) ............................................................................. 26

*Certain Underwriters at Lloyd's, London Subscribing
to Policy No. W15F03160301 v. Houligan's Pub & Club, Inc.*,
   2019 WL 5611557 (Fla. Cir. Ct. Oct. 24, 2019) ............................................... 26, 27

*Checker Cab Operators, Inc. v. Miami-Dade Cnty.*,
  899 F.3d 908 (11th Cir. 2018) .................................................................. 6

*Christ v. Beneficial Corp.*,
  547 F.3d 1292 (11th Cir. 2008) .............................................................. 39

*City of Chicago v. Factory Mut. Ins. Co.*, No. 02 C 7023,
  2004 WL 549447 (N.D. Ill. Mar. 18, 2004) ........................................... 33

*Colony Ins. Co. v. Nicholson*,
  2010 WL 3522138 (S.D. Fla. Sept. 8, 2010) .......................................... 15

*Customized Distrib. Servs. v. Zurich Ins. Co.*,
  862 A.2d 560 (N.J. App. Div. 2004) ....................................................... 17

*Davis v. S. Bell Tel. & Tel. Co.*,
  1993 WL 593999 (S.D. Fla. Dec. 23, 1993) ........................................... 38

*Desmond v. Citimortgage, Inc.*,
  2015 WL 845571 (S.D. Fla. Feb. 25, 2015) ...................................... 38, 39

*Dow Chem. Co. v. Royal Indem. Co.*,
  635 F.2d 379 (5th Cir. 1981) .................................................................... 9

*Dwyer v. Globe Life & Accident Ins. Co.*,
  2019 WL 8014500 (S.D. Fla. Nov. 25, 2019) .................................... 23, 24

*Fabricant v. Sears Roebuck*,
  202 F.R.D. 310 (S.D. Fla. 2001) ............................................................ 38

*Fayad v. Clarendon Nat'l Ins. Co.*,
  899 So. 2d 1082 (Fla. 2005) .............................................................. 9, 23

*First Specialty Ins. Corp. v. GRS Mgmt. Assocs., Inc.*,
  2009 WL 2524613 (S.D. Fla. Aug. 17, 2009) ........................................ 29

*Geovera Specialty Ins. Co. v. House*,
  2009 WL 10668520 (S.D. Fla. Sept. 11, 2009) ...................................... 23

*Gomez v. Allied Professionals Ins. Co.*,
  2020 WL 2197865 (S.D. Fla. May 6, 2020) ............................................ 24

*Gov't Employees Ins. Co. v. Macedo*,
  228 So. 3d 1111 (Fla. 2017) ................................................................... 25

*Great Lakes Reinsurance (UK) PLC v. Kan-Do, Inc.*,
  639 F. App'x 599 (11th Cir. 2016) ............................................... 9, 10, 13

*Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.*,
  2014 WL 6675934 (D.N.J. Nov. 25, 2014) ............................................. 14

*Herrera v. JFK Med. Ctr. Ltd. P'ship*,
  648 F. App'x 930 (11th Cir. 2016) .................................................... 34, 35

*Holmes v. Cont'l Can Co.*,
  706 F.2d 1144 (11th Cir. 1983) .............................................................. 38

iii

*Homeowners Choice Prop. & Cas. v. Miguel Maspons*,
  211 So. 3d 1067 (Fla. 3d DCA 2017) ........................................................ 14, 17

*Huff v. N.D. Cass Co. of Ala.*,
  485 F.2d 710 (5th Cir.1973) ..................................................................... 34

*In re Checking Account Overdraft Litig.*,
  2012 WL 12877717 (S.D. Fla. July 19, 2012) ........................................ 40

*Int'l Ins. Co. v. Johns*,
  874 F.2d 1447 (11th Cir. 1989) ............................................................... 11

*Ionian Corp. v. Country Mut. Ins. Co.*,
  2012 WL 13051117 (D. Or. July 17, 2012) ............................................ 13

*James D. Hinson Elec. Contracting Co. v. AT & T Servs., Inc.*,
  2014 WL 1118015 (M.D. Fla. Mar. 20, 2014) ........................................ 40

*James River Ins. Co. v. Epic Hotel, LLC*,
  2013 WL 12085984 (S.D. Fla. Jan. 9, 2013) ..................................... 29, 36

*Jermyn v. Best Buy Stores, L.P.*,
  276 F.R.D. 167 (S.D.N.Y. 2011) ............................................................ 38

*Joseph Oliver Constr., LLC v. Utica First Ins. Co.*,
  2020 WL 3791564 (E.D. Pa. July 7, 2020) ............................................ 24

*Kean, Miller, Hawthorne, D'Armond McCowan & Jarman, LLP
v. Nat'l Fire Ins. Co. of Hartford*,
  2007 WL 2489711 (M.D. La. Aug. 29, 2007) ........................................ 32

*Klay v. Humana, Inc.*,
  382 F.3d 1241 (11th Cir. 2004) ............................................................... 40

*LaMadrid v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
  567 F. App'x 695 (11th Cir. 2014) .......................................................... 10

*Landrum v. Allstate Ins. Co.*,
  811 F. App'x 606 (11th Cir. 2020) .......................................................... 16

*Lubell & Rosen LLC v. Sentinel Ins. Co., Ltd.*,
  2016 WL 8739330 (S.D. Fla. June 10, 2016) ............................... 18, 21, 31

*Mama Jo's, Inc. v. Sparta Insurance Co.*,
  2018 WL 3412974  (S.D. Fla. June 11, 2018) .................................... 18, 19

*Martorella v. Deutsche Bank Nat. Tr. Co.*,
  931 F. Supp. 2d 1218 (S.D. Fla. 2013) .............................................. 38, 39

*Maryland Cas. Co. v. W.R. Grace & Co.*,
  128 F.3d 794 (2d Cir. 1997) .................................................................... 12

*Matzner v. Seaco Ins. Co.*,
  1998 WL 566658 (Mass. Super. Aug. 26, 1998) .................................... 15

*Miadeco Corp. v. Miami-Dade Cnty.*,
  249 F. Supp. 3d 1296 (S.D. Fla. 2017) ..................................................... 6

*Mills v. Foremost Ins. Co.*,
  511 F.3d 1300 (11th Cir. 2008)...................................................................... 35

*Morrison Grain Co., Inc. v. Utica Mut. Ins. Co.*,
  632 F.2d 424 (5th Cir.1980)......................................................................... 10

*Motisola Malikha Abdallah v. Coca–Cola Co.*,
  1999 WL 527835 (N.D. Ga. July 16, 1999)................................................. 39

*MSPA Claims I, LLC v. Century Sur. Co.*,
  2017 WL 998282 (S.D. Fla. Mar. 15, 2017) ............................................... 34

*Murray v. State Farm Fire & Cas. Co.*,
  203 W. Va. 477, 509 S.E.2d 1 (1998) ......................................................... 15

*Nova Cas. Co. v. Waserstein*,
  424 F. Supp. 2d 1325 (S.D. Fla. 2006)........................................................ 29

*Paul Revere Life Ins. Co. v. First Nat'l Bank in Dallas*,
  359 F.2d 641 (5th Cir. 1966)....................................................................... 15

*Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*,
  311 F.3d 226 (3d Cir. 2002) ........................................................................ 14

*Quindlen v. Prudential Ins. Co. of Am.*,
  482 F.2d 876 (5th Cir. 1973)....................................................................... 16

*Randy Rosenberg, D.C., P.A. v. GEICO Gen. Ins. Co.*,
  2019 WL 6828150 (S.D. Fla. Dec. 13, 2019) ...................................... 34, 36

*Rockhill Ins. Co. v. Northfield Ins. Co.*,
  297 F. Supp. 3d 1279 (M.D. Fla. 2017) .............................................. 18, 20

*Romano v. Motorola, Inc.*,
  2007 WL 4199781 (S.D. Fla. Nov. 26, 2007) ............................................ 34

*Sentinel Mgmt. Co. v. New Hampshire Ins. Co.*,
  563 N.W.2d 296 (Minn. Ct. App. 1997) .................................................... 15

*Southern Hospitality v. Zurich American Insurance Co.*,
  393 F.3d 1137 (10th Cir. 2004).................................................................. 32

*Sporting Prods., LLC v. Pac. Ins. Co., Ltd.*,
  2012 WL 13018367 (S.D. Fla. Jan. 6, 2012) ...................................... 1, 10

*State Farm Fire & Cas. Co. v. CTC Dev. Corp.*,
  720 So. 2d 1072 (Fla. 1998) ................................................................. 21, 22

*State Farm Fire & Cas. Ins. Co. v. Deni Assocs. of Fla., Inc.*,
  678 So. 2d 397 (Fla. 4th DCA 1996); *aff'd*, 711 So. 2d 1135 (Fla. 1998)................................ 23

*State Farm Mut. Auto. Ins. Co. v. Mashburn*,
  15 So. 3d 701 (Fla. 1st DCA 2009)...................................................... 20, 22

*State Farm Mut. Auto Ins. Co. v. Pridgen*,
  498 So. 2d 1245 (Fla. 1986)........................................................................ 15

*Studio 417, Inc. v. Cincinnati Ins.*,
  2020 WL 4692385 (W.D. Mo. Aug. 12, 2020) ................................................................. 16, 34

*Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*,
  845 So. 2d 161 (Fla. 2003) ............................................................................................. 20, 22

*Syufy Enters. v. Home Ins. Co. of Ind.*,
  1995 WL 129229 (N.D. Cal. Mar. 21, 1995) ........................................................................ 33

*Three Palms Pointe, Inc. v. State Farm Fire & Cas. Co.*,
  250 F. Supp. 2d 1357 (M.D. Fla. 2003); *aff'd*, 362 F.3d 1317 (11th Cir. 2004) ................ 14, 19

*Total Intermodal Servs. Inc. v. Travelers Prop. Cas. Co. of Am.*,
  2018 WL 3829767 (C.D. Cal. July 11, 2018) ........................................................................ 16

*TRAVCO Ins. Co. v. Ward*,
  715 F. Supp. 2d 699 (E.D. Va. 2010) .................................................................................... 15

*Travelers Indem. Co. of Am. v. L.H.R. Farms, Inc.*,
  2010 WL 11603153 (N.D. Ga. May 18, 2010) ....................................................................... 24

*Travelers Indem. Co. v. Northrop Grumman Corp.*,
  413 F. Supp. 3d 263 (S.D.N.Y. 2019) .................................................................................... 12

*United Airlines, Inc. v. Ins. Co. of State of Pa.*,
  385 F. Supp. 2d 343 (S.D.N.Y. 2005) .................................................................................... 33

*Universal Express, Inc. v. U.S. S.E.C.*,
  177 F. App'x. 52 (11th Cir. 2006) ........................................................................................... 6

*USA Entm't Grp., Inc. v. Israel*,
  2017 WL 4553441 (S.D. Fla. Oct. 12, 2017) ......................................................................... 33

*Wakefern Food Corp. v. Liberty Mut. Fire Ins. Co.*,
  968 A.2d 724 (N.J. App. Div. 2009) ...................................................................................... 17

*Williams v. Wells Fargo Bank, N.A.*,
  280 F.R.D. 665 (S.D. Fla. 2012) ...................................................................................... 37, 40

*Williams v. Wells Fargo Fin. Servs., Inc.*,
  2012 WL 12865256 (S.D. Fla. July 25, 2012) ....................................................................... 37

## **Statutes**

Fla. Stat. § 627.419(1) (2020) ...................................................................................................... 12

## **Rules**

Fed. R. Evid. 201 ................................................................................................................... 6, 31

## Other Authorities

Amanda Heidt, *Giant viruses aren't alive. So why have they stolen the genes essential for life?*,
   Science (Apr. 16, 2020), ..................................................................................... 25

Antonin Scalia & Bryan A. Garner,
   *Reading Law: The Interpretation of Legal Texts*, 116 (2012) .................................... 16

Laura Geggel, *Are Viruses Alive?*,
   Live Science, Feb. 25, 2017 ..................................................................................... 25

Luis P. Villarreal, *Are Viruses Alive?*,
   SCIENTIFIC AMERICAN, Aug. 8, 2008 ....................................................................... 25

Taylor McNeil, *What Are Viruses and How Do They Work?*,
   Tufts University (Apr. 3, 2020) ................................................................................. 25

*What Are Microorganisms?*,
   University of Bergen Centre for Geobiology, Jan. 11, 2010 .................................... 25

Wright & Miller, 7AA FED. PRAC. & PROC. CIV. § 1775 (3d ed.)................................. 39

## INTRODUCTION

The global COVID-19 pandemic is both a public health and an economic catastrophe. The novel coronavirus has spread throughout the United States with alarming speed, not only infecting millions, but also forcing the most significant economic downturn this country has seen in decades. Its rapid spread has forced restaurants, bars, gyms, and other "non-essential" businesses to close, both because consumers have been encouraged to "socially distance," and by order of state and local governments. The resulting financial losses have been severe; many businesses have closed their doors for good, while others hang in the balance.

Many business owners have looked to their "all-risk" insurance policies to cover these unexpected losses. Insurers nationwide have uniformly denied the claims, contending that the policies—which expressly cover the insured's business income losses arising from the "direct physical loss of or damage to" covered property—do not cover losses arising from the COVID-19 pandemic because the insured properties have not suffered structural damage. But insurers have covered nonstructural "direct physical losses of" property for many years.[1] Now, faced with this crisis, they seek to unreasonably narrow that term's application in violation of its plain meaning and Florida law.

Plaintiffs El Novillo Restaurant d/b/a DJJ Restaurant Corp. and El Novillo Restaurant d/b/a Triad Restaurant Corp. hold "all-risk" insurance policies issued by Defendants. All-risk policies cover *all* fortuitous losses, including those "not usually contemplated" by a policy of insurance.[2]

---

[1]  Plaintiffs intend during discovery to examine the history of claims paid by the defendant and related Lloyd's underwriters over the last decade to demonstrate that the insurer historically covered such losses.

[2]  *Sporting Prods., LLC v. Pac. Ins. Co., Ltd.*, No. 10-80656-CIV, 2012 WL 13018367, at *10 (S.D. Fla. Jan. 6, 2012) ("An 'all-risks' policy of insurance provides a special type of coverage that extends to risks not usually contemplated.") (citation omitted).

1

The law is clear that if an insurer wishes to exclude a category of risks from coverage, then it must do so clearly, specifically, and in writing. Plaintiffs' all-risk policies exclude losses arising directly or indirectly from catastrophic events such as war, nuclear radiation, terrorism, and biological warfare. Nowhere, however, do their policies exclude losses arising from pandemics, epidemics, public health emergencies, or related government-mandated shutdowns.

Plaintiffs' policies cover business income losses resulting from any Covered Cause of Loss. The policies bind Defendants to pay for business income lost due to the suspension of Plaintiffs' business operations, so long as the suspension (defined to mean cessation *or* slowdown) resulted from the "direct physical loss of or damage to" covered property. Neither "direct physical loss of" nor "damage to" is defined in Plaintiffs' policies. Had insurers intended to limit coverage to structural losses, they could have done so in plain terms. Accordingly, and given courts' obligation to read policies in favor of the insured, courts in Florida and nationwide have held that "direct physical loss of or damage to" does not connote only structural damage.

This construction makes sense given a holistic reading of the Policies. The Policies use the term "direct physical loss" in at least two provisions:  the definition of "Covered Causes of Loss," and the Business Income (and Extra Expense) Coverage Form. The Policies define a "Covered Cause of Loss" as any "*direct physical loss*, unless the loss is excluded or limited in this policy." Thus, all losses covered *and* excluded from coverage are "direct physical losses"; if all direct physical losses comprise an entire set of losses that are covered, then any subset—*i.e.* any exclusion—is also a "direct physical loss." The exclusions carved out from the policies' covered risks include, among others, losses caused directly or indirectly by power failures, nuclear reactions, and the seizure or requisition of property by government order. The "direct physical losses" contemplated by these exclusions are not necessarily structural, and include those that

2

deprive the insured of the property's intended use. "Direct physical loss" cannot mean different things in different provisions. The same meaning must be given to "direct physical loss" in the context of the Policies' business income coverage.

The Policies' plain language supports this construction. The policies cover losses occasioned by "direct physical loss of _**or**_ damage to" covered property. The use of the disjunctive indicates that "direct physical loss" and "damage" cannot be afforded the same meaning. Because "damage to" property would certainly include structural damage to property, the "direct physical loss of" property must mean something else. Common definitions of "direct," "physical," and "loss" adopted by Florida courts suggest that "direct physical loss" may mean "actual loss of possession" or the "loss of something material." Because the Court must give undefined policy terms their least restrictive meaning, Plaintiffs' temporary loss of their property for its intended use qualifies as a "direct physical loss." The policies therefore cover Plaintiffs' lost business income.

Defendants have not met their burden of establishing that Plaintiffs' losses are excluded from coverage. Insurers are responsible for stating clearly and specifically what risks are excluded from coverage, and Defendants have not excluded losses arising from pandemics, public health emergencies, or government-mandated business closures. They had the option to do so: ISO standard form CP 01 40 07 06, "Exclusion for Loss Due to Virus or Bacteria," excludes from coverage loss or damage "caused by or resulting from any virus." Had Defendants intended to exclude losses arising from global pandemics from coverage, they could have added this "virus exclusion" to Plaintiffs' policies.[3]

---

[3]  Plaintiffs do not concede that the "virus exclusion" set forth in ISO form CP 01 40 07 06 would exclude similar losses from coverage. Regardless, Defendants' election not to apply the exclusion in Plaintiffs' policies reflects a lack of intent to exclude virus-related claims from coverage.

The policies' microorganism and pollution exclusions do not achieve the same end. These exclusions apply when microorganisms, pollutants, contaminants or other substances are present on or attach to covered property. Plaintiffs do not allege that the novel coronavirus was present in their restaurants. They instead claim business income losses resulting from the pandemic and state and county emergency orders that caused a slowdown in their business. The Policies' Microorganism Exclusion is further inapplicable because a virus is not a microorganism.

Plaintiffs are also entitled to coverage under the policies' civil authority provision, which provides additional coverage for losses suffered when a Covered Cause of Loss causes damage to other property, and a civil authority order prohibits access to covered property because of a dangerous physical condition surrounding the property. Here, the COVID-19 pandemic caused damage to property and created a dangerous physical condition throughout Miami-Dade County. The novel coronavirus spread rapidly from person to person, and attached to surfaces, which led to state and county orders both restricting and prohibiting access to Plaintiffs' restaurants.

Finally, Defendants' motion to dismiss Plaintiffs' claims based on their class allegations is exceedingly premature. Class certification is an evidentiary question, and Plaintiffs have not yet taken class discovery. Indeed, such dismissals are appropriate only when a court can discern from the face of the complaint that certification would be impossible. That is not the case here.

The Court should deny Defendants' Motion to Dismiss.

## **BACKGROUND**

In the fall of 2019, a new mutation of coronavirus was detected in China. First Am. Compl. [D.E. 20] ("FAC") ¶ 22. The World Health Organization named the new virus SARS-CoV-2, and the respiratory disease that develops in humans who have contracted the virus COVID-19. *Id.* The novel coronavirus quickly spread from China to other parts of the world, including the United States. *Id.* ¶ 23. On March 11, 2020, the World Health Organization declared the COVID-19

4

outbreak to be a global pandemic: a worldwide epidemic caused by a virus to which humans have no natural immunity. *Id*.

COVID-19 is highly contagious and easily transmitted. *See id.* ¶ 25 n.5 (citing guidance providing that COVID-19 "is spreading very easily and sustainably between people"). Without a vaccine to protect against COVID-19, effective control of its spread relies on measures designed to minimize human-to-human and surface-to-human exposure.[4] *Id.* ¶ 25. The government and the scientific community have recommended that people avoid gathering in groups and maintain "social distancing," which includes avoiding restaurants and other gathering places, wearing face coverings, and working from home to avoid transmission. *Id.* ¶ 3 & n.3, ¶ 25 & n.5, ¶ 26.

**Florida and Miami-Dade County Issue "Stay-at-Home" Orders**

In keeping with these recommendations, states and municipalities began to issue "stay at home" orders in March 2020, many of which mandated closure or restricted the operations of designated "non-essential" businesses, including restaurants. *Id.* ¶¶ 4, 5, 27, 28. Both the State of Florida and Miami-Dade County have issued such civil authority orders. For example:

- On March 16, 2020, Miami-Dade County Mayor Carlos Gimenez issued Emergency Order 02-20 restricting operating times for all restaurants within Miami-Dade County to 6 a.m. to 11 p.m., other than for delivery, *id.* ¶ 45;

- On March 17, 2020, Florida Governor Ron DeSantis issued Executive Order 20-68, restricting restaurant operations in the State of Florida, *id.* ¶ 46;

- On the same day, Miami-Dade County Mayor Carlos Gimenez issued Emergency Order 03-20 closing all restaurants in Miami-Dade County other than for delivery or takeout, *id.*;

- These closings remained in effect until May 15, 2020, when Governor DeSantis issued

---

[4]     Additionally, on July 9, 2020, the World Health Organization advised that short-range aerosol or "airborne" transmission of COVID-19 "cannot be ruled out." World Health Organization, *Transmission of SARS-CoV-2: implications for infection prevention precautions*, (July 9, 2020) https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions.

Executive Order 20-123, partially lifting restrictions on restaurants but keeping in place limited occupancy, and requiring personal protective measures and structural changes within the properties to safeguard employees and customers, *id.*; and

- On July 8, 2020, Miami-Dade County Mayor Carlos Gimenez issued Amendment No. 2 to Emergency Order 26-20, effective on July 9th, limiting restaurants and cafeterias to outdoor on-site service between the hours of 6:00 a.m. and 10:00 p.m., and allowing pickup, delivery, and takeout only after 10:00 p.m.[5]

As a direct result of the COVID-19 pandemic and these governmental orders, Plaintiffs suffered a business interruption—they lost business and were compelled to relinquish full use of their properties, suspend their business operations, and furlough employees. FAC ¶ 48.

Plaintiffs have faithfully paid their premiums and Defendants have accepted payment, and as such are obligated to honor their contractual duty to provide coverage for the business losses and extra expense suffered. *Id.* ¶ 49. Defendants have no intention of providing any coverage under the policies due to any business income losses or expense incurred by policyholders because the losses and expense incurred derives from the COVID-19 pandemic. *Id.* ¶ 50. Indeed, they have taken the position in this litigation that Plaintiffs' losses are not covered. *Id.*

---

[5]   Amendment 2 to Order 26-20 replaced the Emergency Order 26-20, which would have closed all bars and restaurants effective July 8, 2020.  *See* Amendment No 2 to Miami-Dade County Emergency Order No. 26-20, available at https://www.miamidade.gov/information/library/07.07.20-amendment-2-to-26-20.pdf. The Court may take judicial notice of Amendment No. 2, as it is central to Plaintiffs' claims, and is a public record generally known within this District and capable of accurate and ready determination from a reliable source. *See, e.g.*, *Miadeco Corp. v. Miami-Dade Cnty.*, 249 F. Supp. 3d 1296, 1300 n.2 (S.D. Fla. 2017), *aff'd in part, vacated in part on other grounds*, *Checker Cab Operators, Inc. v. Miami-Dade Cnty.*, 899 F.3d 908 (11th Cir. 2018) (taking judicial notice of Miami-Dade municipal code on ground, *inter alia*, that "'[p]ublic records are among the permissible facts that a district court may consider'") (quoting *Universal Express, Inc. v. U.S. S.E.C.*, 177 F. App'x. 52, 53 (11th Cir. 2006)); *10th St. Partners, LLC v. Cty. Comm'n ex rel. Sarasota Cnty.*, No. 8:11-CV-2362-T-33TGW, 2012 WL 4328655, at *3 (M.D. Fla. Sept. 20, 2012) (taking judicial notice of Sarasota County ordinances because ordinances were a "municipal document is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"); Fed. R. Evid. 201.
.

**Plaintiffs File Claims Under Their "All-Risk" Lloyd's Policies**

On March 17, 2020, Plaintiffs filed claims with Defendant Lloyd's against their "all-risk" insurance policies (the "Policies"). *See* Motion Exs. C & D. The Policies consist of standard ISO all-risk commercial property insurance policy forms, under which Plaintiffs agreed to pay premiums in exchange for Defendants' promise to indemnify Plaintiffs for losses including, but not limited to, business income losses at the insured properties. FAC ¶ 41. The Policies include the ISO standard Business Income (and Extra Expense) Coverage Form, designated as form CP 00 30 10 12, which provides coverage as follows:

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of such premises.

Motion Ex. B [D.E. 24-2] at 37[6]; FAC ¶ 32.

"Covered Cause of Loss" is defined in Plaintiffs' and the Class members' policies as any cause of loss not expressly excluded, and must be construed broadly and given its most comprehensive meaning.[7] Motion Ex. B at 49; FAC ¶ 33.

---

[6]   Citations to "Motion Ex. B"—Plaintiffs' Policy—are to the page numbers assigned by the Court's filing system. Thus, the above citation to" Motion Ex. B at 37" refers to page 37 of 78 of the Policy, as indicated in the exhibit's header.

[7]   "Business Income" is defined as:

    a.   Net income (Net Profit or Loss before income taxes) that would have
         been earned or incurred; and

    b.   Continuing normal operating expenses incurred, including payroll.

As relevant here, "suspension" means "[t]he slowdown or cessation of your business activities" or "[t]hat a part or all of the described premises is rendered untenantable, if coverage for Business Income Including 'Rental Value' or 'Rental Value' applies." *Id.* ¶ 35. The Policies do not require that business operations cease entirely, or that the insured lose all use of the insured premises in order to trigger coverage. *Id.*

The "period of restoration" is the period of time beginning 72 hours after physical loss or damage to the property and ending on the date when the property is repaired, replaced, or rebuilt, or the business resumes at a new location, whichever comes first. *Id.* ¶ 36.

Form CP 00 30 10 12 also includes a provision for "Additional Coverages-Civil Authority," which can be triggered even when the standard business interruption coverage is not. *Id.* ¶ 39.  It provides:

> When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:
>
> (1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and
>
> (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

*Id.*; Motion Ex. B at 38.

In a Florida Changes endorsement, Defendants expand the scope of the Policies' civil authority coverage, waiving the one-mile requirement for Florida insureds. *See id.* at 73 ("The Additional Coverage - Civil Authority includes a requirement that the described premises are not

more than one mile from the damaged property. With respect to described premises located in Florida, such one-mile radius does not apply.").

"Physical loss," "loss," "damage," and property damage" are undefined in the Policies. *See* Motion Ex. B.

The Policies set forth various exclusions. Many of those exclusions are broad in scope, excluding losses arising directly or indirectly from, for example, wars and nuclear radiation. *See id.* at 12; 49-50 of 78. However, the Policies do not exclude losses arising from global pandemics, epidemics, public health emergencies, or related government-mandated business closures. All losses not expressly excluded by the Policies are defined as Covered Causes of Loss. *See id.* at 49.

## **Procedural Background**

Plaintiffs filed their original complaint in this action on April 9, 2020. [D.E. 1.] Defendants filed a motion to dismiss on June 22, 2020. [D.E. 18.] Plaintiffs amended their complaint on July 6, 2020 [D.E. 20], and Defendants again moved to dismiss on July 16, 2020. [D.E. 24.]

## **ARGUMENT**

## I.   **PLAINTIFFS' LOSSES ARE COVERED BY DEFENDANTS' ALL-RISK POLICIES.**

Insurance policies covering "direct physical losses" of property are "all-risk" Policies under Florida law. *See Fayad v. Clarendon Nat'l Ins. Co.*, 899 So. 2d 1082, 1085 (Fla. 2005). "[A]ll-risk insurance policies cover all 'fortuitous' losses, 'unless the policy contains a specific provision expressly excluding the loss from coverage.'" *Great Lakes Reinsurance (UK) PLC v. Kan-Do, Inc.*, 639 F. App'x 599, 601 (11th Cir. 2016) (quoting *Dow Chem. Co. v. Royal Indem. Co.*, 635 F.2d 379, 386 (5th Cir. 1981) ("A policy of insurance insuring against 'all risks' creates a special type of coverage that extends to risks not usually covered under other insurance; recovery under an all-risk policy will be allowed for all fortuitous losses not resulting from misconduct or

fraud, unless the policy contains a specific provision expressly excluding the loss from coverage.")). "A fortuitous event ... is an event which so far as the parties to the contract are aware, is dependent on chance. It may be beyond the power of any human being to bring the event to pass; it may be within the control of third persons; it may even be a past event, as the loss of a vessel, provided that the fact is unknown to the parties." *Id.* (quoting *Morrison Grain Co., Inc. v. Utica Mut. Ins. Co.,* 632 F.2d 424, 431 (5th Cir.1980)); *see also, e.g., Sporting Prods., LLC v. Pac. Ins. Co., Ltd.*, No. 10-80656-CIV, 2012 WL 13018367, at *10 (S.D. Fla. Jan. 6, 2012) ("An 'all-risks' policy of insurance provides a special type of coverage that extends to risks not usually contemplated.") (citation omitted).

In order to recover under an all-risk policy, an insured must identify (1) a fortuitous loss (2) that occurred during the policy period. *Great Lakes Reinsurance*, 639 F. App'x at 601 (citing *Banco Nacional De Nicaragua v. Argonaut Ins. Co.,* 681 F.2d 1337, 1340 (11th Cir. 1982)). "Th[e] burden of demonstrating fortuity is not a particularly onerous one." *LaMadrid v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 567 F. App'x 695, 701 (11th Cir. 2014) (internal quotations omitted). "Once the insured meets the light burden of establishing that a loss occurred due to some fortuitous event or circumstance, the burden shifts to the insurer to show that the loss is excluded by some language set out in the policy." *Great Lakes Reinsurance*, 639 F. App'x at 601.

The COVID-19 pandemic and ensuing state and county emergency orders caused fortuitous losses which are not covered by any exclusion set forth in the Policies. As demonstrated below:

(A)    Structural damage is not required to trigger coverage. "Direct physical loss of or damage to property" is not defined by the Policies, and must be read to include intangible losses such as the loss of the property's intended use.

10

(B)      Plaintiffs' losses are not excluded by any Policy provision. Plaintiffs do not allege that their properties were contaminated by a microorganism, a "pollutant," or any "seepage" or "contaminant," and, in any event, viruses are not microorganisms.

(C)      The civil authority orders issued by the State of Florida and Miami-Dade County were issued in response to a public health emergency—a global pandemic—which caused damage to property surrounding the Plaintiffs' premises. The Governor of Florida and the Mayor of Miami-Dade County issued emergency orders prohibiting customer access to Plaintiffs' restaurants, which triggered additional coverage under the civil authority provision of Plaintiffs' Policies.

### A. Structural Damage Is Not Required to Trigger Coverage for Business Interruption Losses Under the Policies.

Business interruption losses are covered by the Policies' Business Income (and Extra Expense) Coverage Form, Form CP 00 30 10 12. *See id.* ¶ 32; Motion Ex. B at 37. This coverage provides, in relevant part:

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by *direct physical loss of or damage to* property at premises which are described in the Declarations and for which a Business Income Limit Of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.

*Id.* (emphasis added).

### 1. A "direct physical loss" of property includes a loss of functionality or intended use.

The definition of "direct physical loss of or damage to" is critical to determining the scope of the Policies' business income coverage. The Policies, however, do not expressly define the term. *See* Motion Ex. B. Accordingly, "direct physical loss of" and "damage to" property must be construed in the context of the entire policy. *See Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1456 (11th Cir. 1989) ("In Florida, a court must construe every insurance contract according to the entirety of

its terms and conditions."); Fla. Stat. § 627.419(1) (2020) ("Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy and as amplified, extended, or modified by any application therefor or any rider or endorsement thereto."). Viewed in this light, the Policies do not support Defendants' conclusion that "direct physical loss of or damage to" connotes only structural damage.

The term "direct physical loss" is central to two critical policy provisions: the definition of "Covered Causes of Loss" and the Policies' Business Income (and Extra Expense) Coverage. These provisions must be read together—the meaning afforded "direct physical loss" in the Covered Cause of Loss definition cannot be isolated from its use in Plaintiffs' business income coverage. *See, e.g., Burlington Ins. Co. v. Indus. Steel Fabricators, Inc.*, 387 F. App'x 900, 904 (11th Cir. 2010) ("Courts[] . . . 'may not isolate a single sentence or group of words in an insurance policy and read the isolated part alone and apart from other provisions; the goal is to arrive at a reasonable interpretation of the entire policy to accomplish its stated meaning and purpose.'") (quoting *Brown v. Travelers Ins. Co.,* 649 So. 2d 912, 914–15 (Fla. 4th DCA 1995)); *Travelers Indem. Co. v. Northrop Grumman Corp.*, 413 F. Supp. 3d 263, 274–75 (S.D.N.Y. 2019) ("Unless there is a '*clear* indication that different meanings were intended' in different parts of the policies, such as through express restrictions ('*only* for the purpose of ...' or 'for the *sole* purpose of ...'), the '[t]erms in a document, especially terms of art, normally have the same meaning throughout the document.'") (emphasis in original; quoting *Maryland Cas. Co. v. W.R. Grace & Co.*, 128 F.3d 794, 799 (2d Cir. 1997) ("Terms in a document, especially terms of art, normally have the same meaning throughout the document in the absence of a clear indication that different meanings were intended.")).

"Direct physical loss" appears first in the Policies' definition of "Covered Causes of Loss."

The Policies define a "Covered Cause of Loss" as a "*direct physical loss*, unless the loss is excluded or limited in this policy." FAC ¶ 33; Motion Ex. B at 49 (emphasis added). All losses covered by the Policies—or the entire set of covered losses—then, are "direct physical losses." That being the case, any loss *excluded* from Plaintiffs' all-risk coverage—any loss or category of losses carved out from the whole, *i.e.* any subset—must also be defined as a "direct physical loss." *See, e.g., Great Lakes Reinsurance*, 639 F. App'x at 603 ("[E]xclusions in coverage are expressly intended to modify coverage clauses and to limit their scope.") (citing *Ajax Bldg. Corp. v. Hartford Fire Ins. Co.,* 358 F.3d 795, 798–99 (11th Cir. 2004)); *Central Int'l Co. v. Kemper Nat'l Ins. Cos.,* 202 F.3d 372, 374 (1st Cir. 2000) ("[U]nder ordinary principles of contract interpretation, there is little doubt that the exclusion is presumptively a qualification on the risk coverage."); *Allstate Ins. Co. v. Preferred Fin. Sols., Inc.*, 8 F. Supp. 3d 1039, 1053 (S.D. Ind. 2014) ("Exclusions operate to preclude coverage otherwise afforded by the indemnity provisions of the contract."); *Ionian Corp. v. Country Mut. Ins. Co.*, No. 3:10-CV-0199-HZ, 2012 WL 13051117, at *4 (D. Or. July 17, 2012) ("[T]he coverage provisions of an insurance policy define the universe of claims that are covered by the policy; the exclusions constitute a subset of claims that, although within that universe of covered claims, are nonetheless excluded.") (citation and internal quotations omitted). Indeed, there would be no reason to draft a specific exclusion for a category of losses not covered in the first instance.

If all excluded losses are "direct physical losses" under the Policies, then, by definition, the term "direct physical loss" necessarily includes, *inter alia*, losses of property:

- arising out of or relating to a "microorganism of any type," even where the microorganism causes "any loss of use, occupancy, or functionality" (Microorganism Exclusion), Motion Ex. B at 10;

- caused directly or indirectly by the "[s]eizure or destruction of property by order of governmental authority" (Governmental Action Exclusion), *id.* at 50;

- "directly or indirectly occasioned by, happening through or in consequence of war, invasion, . . . military or usurped power or *confiscation or nationalization or requisition . . . of . . . to property by or under the order of any government or public or local authority*" (War and Civil War Exclusion Clause), *id.* at 12 (emphasis added);

- "arising directly or indirectly from nuclear reaction, nuclear radiation or radioactive contamination," (Radioactive Contamination Exclusion Clause-Physical Damage-Direct), *id.*; and

- caused directly or indirectly by the "failure of power, communication, water or other utility service supplied to the described premises" (Utility Services Exclusion), *id.*at 50.

The losses contemplated by these exclusions are not "physical" losses in the sense promoted by Defendants. *See* Motion at 11-18. They encompass losses that do not arise from structural or tangible damage to covered property, but instead deprive the insured of the property's intended use. Courts in Florida and nationwide agree that "direct physical losses" are not limited to losses arising from structural damage to covered property, and include losses of functionality. *See, e.g., Three Palms Pointe, Inc. v. State Farm Fire & Cas. Co.*, 250 F. Supp. 2d 1357, 1364 (M.D. Fla. 2003), *aff'd*, 362 F.3d 1317 (11th Cir. 2004) ("*Azalea* stands for the proposition that under Florida law 'direct physical loss' includes more than losses that harm the structure of the covered property.") (discussing *Azalea, Ltd. v. Am. States Ins. Co.*, 656 So. 2d 600 (Fla. 1st DCA 1995)); *Homeowners Choice Prop. & Cas. v. Miguel Maspons*, 211 So. 3d 1067, 1069 (Fla. 3d DCA 2017) (defining "direct physical loss" to mean "actual loss," and holding that a loss of functionality is therefore a "direct physical loss"); *see also, e.g., Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3d Cir. 2002) ("physical loss or damage" occurs where release of asbestos "nearly eliminates or destroys" property's function, renders the structure "useless or uninhabitable," or "if there exists an imminent threat of the release of a quantity of asbestos fibers that would cause such loss of utility"); *Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.*, No. 2:12-CV-04418 WHW, 2014 WL 6675934, at *6 (D.N.J. Nov. 25, 2014) (ammonia discharge inflicted 'direct physical loss of or damage to' packaging facility where

14

ammonia levels "rendered the facility unfit for occupancy"); *TRAVCO Ins. Co. v. Ward*, 715 F.

Supp. 2d 699, 708 (E.D. Va. 2010), *aff'd*, 504 F. App'x 251 (4th Cir. 2013) ("The majority of

cases appear to support Defendant's position that physical damage to the property is not necessary,

at least where the building in question has been rendered unusable by physical forces.").[8]

    This construction accords with the Policies' plain language. First, had Defendants intended

"direct physical loss of or damage to" property to include only structural damage, they could have

drafted their policies to cover only business income losses "caused by structural damage." They

chose not to do so. They cannot now give "direct physical loss of" its narrowest possible

interpretation. *See, e.g., Paul Revere Life Ins. Co. v. First Nat'l Bank in Dallas*, 359 F.2d 641, 647

n.3 (5th Cir. 1966) ("The insurer has chosen the terms and it must be held to their full measure in

this clause, as in any other, whether its promise be for more or less.");[9] *Colony Ins. Co. v.

Nicholson*, No. 10-60042-CIV, 2010 WL 3522138, at *3 (S.D. Fla. Sept. 8, 2010) ("A reasonable

layperson is . . . likely to assume that a sophisticated insurer has chosen its words carefully.");

*State Farm Mut. Auto Ins. Co. v. Pridgen*, 498 So. 2d 1245, 1247 n.3 (Fla. 1986) (undefined terms

are interpreted liberally in favor of the insured).

    Second, Plaintiffs' Business Coverage (and Extra Expense) Form provides coverage for

---

[8] *See also, e.g., Murray v. State Farm Fire & Cas. Co.*, 203 W. Va. 477, 493, 509 S.E.2d 1, 17 (1998) (where home became uninhabitable under threat of impeding rockslide, "[l]osses covered by the policy, including those rendering the insured property unusable or uninhabitable, may exist in the absence of structural damage to the insured property"); *Matzner v. Seaco Ins. Co.*, 96-0498-B, 1998 WL 566658 (Mass. Super. Aug. 26, 1998) (carbon monoxide causing loss of use of apartment building constituted direct physical loss); *Sentinel Mgmt. Co. v. New Hampshire Ins. Co.*, 563 N.W.2d 296, 300 (Minn. Ct. App. 1997) ("Direct physical loss also may exist in the absence of structural damage to the insured property[,]" and coverage may extend to losses where a "building's function may be seriously impaired or destroyed and the property rendered useless.").

[9] In *Bonner v. City of Pritchard*, 661 F.2d 1206 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all Fifth Circuit cases decided prior to October 1, 1981.

any "suspension" of "operations" caused by "direct *physical loss of* **or** *damage to*" property at the premises described in the Declarations.  *See* FAC ¶ 32; Motion Ex. B at 37 of 78 (emphasis added). The use of the disjunctive "or" indicates that a "loss of" property is distinct from "damage to" property. *See Landrum v. Allstate Ins. Co.*, 811 F. App'x 606 (11th Cir. 2020) ("Use of the disjunctive 'or' in the policy 'indicates alternatives and requires that those alternatives be treated separately[.]") (quoting *Quindlen v. Prudential Ins. Co. of Am.*, 482 F.2d 876, 878 (5th Cir. 1973), and citing Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, 116 (2012) ("Under the conjunctive/disjunctive canon, ... *or* creates alternatives.")); *Studio 417, Inc. v. Cincinnati Ins. Co.*, No. 20-CV-03127-SRB, 2020 WL 4692385, at *5 (W.D. Mo. Aug. 12, 2020) (rejecting defendant's argument that policy required a "tangible, physical alteration" due in part to disjunctive construction); *Total Intermodal Servs. Inc. v. Travelers Prop. Cas. Co. of Am.*, No. CV 17-04908 AB (KSX), 2018 WL 3829767, at *3 (C.D. Cal. July 11, 2018) ("[T]o interpret 'physical loss of' as requiring 'damage to' would render meaningless the 'or damage to' portion of the same clause, thereby violating a black-letter canon of contract interpretation—that every word be given a meaning."). The terms "damage" and "property damage" are undefined by the Policies, but certainly include structural damage to property.[10] Thus, "direct physical loss of"

---

[10]  "Damage" and property damage certainly include structural damage, but may not be so limited. "Damage" means "physical harm that is done to something," but also simply "harm or injury," "harm that is done to someone or something that makes them less successful," *Damage*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/damage; "injury or harm that reduces value or usefulness," *Damage*, Dictionary, https://www.dictionary.com/browse/damage; and "loss or harm resulting from injury to person, property, or reputation," *Damage*, Merriam-Webster, https://www.merriam-webster.com/dictionary/damage.

property cannot be limited to mean only structural damage.[11]

Finally, reading the Policies to cover nonstructural losses accords with the common meaning afforded their plain terms. "Direct" means "[f]ree from extraneous influence," "immediate," and "characterized by close logical, causal, or consequential relationship."[12] "Physical," may refer, in relevant part, to things "[o]f or pertaining to matter, or the world as perceived by the senses; material as [opposed] to mental or spiritual." *Physical*, 2 Shorter OXFORD ENGLISH DICTIONARY 2194 (6th ed. 2007); *see also Wakefern Food Corp. v. Liberty Mut. Fire Ins. Co.*, 968 A.2d 724, 735 (N.J. App. Div. 2009) ("Since 'physical' can mean more than material alteration or damage, it was incumbent on the insurer to clearly and specifically rule out coverage in the circumstances where it was not to be provided[.]" (quoting *Customized Distrib. Servs. v. Zurich Ins. Co.,* 862 A.2d 560 (N.J. App. Div. 2004)). Another source defines "physical" to mean "of or relating to material things," or "having material existence: perceptible especially through the senses and subject to the laws of nature." *Physical*, Merriam-Webster, https://www.merriam-webster.com/dictionary/physical.  Elsewhere, "direct" and "physical" have been read to modify loss, and together mean "actual." *See Maspons*, 211 So. 3d at 1069.

"Loss" means "[a]n undesirable outcome of a risk; the disappearance or diminution of value, usu[ally] in an unexpected or relatively unpredictable way," *Loss* BLACK'S LAW DICTIONARY (11th ed. 2019), or "[t]he fact or process of losing something or someone." *Loss*,

---

[11] Defendants fail to address this disjunctive construction in their Motion. They acknowledge that the Policies' Business Income (and Extra Expense) Form require "direct physical loss of or damage to" the property for coverage to attach, and then summarily conclude that Plaintiffs must plead "what damage occurred, how the physical damage occurred, and when the physical damage occurred." Motion at 12-13.

[12] *Direct*, BLACK'S LAW DICTIONARY (11th ed. 2019); *Direct*, Merriam-Webster Dictionary, www.merriaum-webseter.com/dictionary/direct.  *Accord Direct*, Oxford English Dictionary, https://www.lexico.com/en/definition/direct ("Without intervening factors or complications").

Oxford English Dictionary, available at https://www.lexico.com/en/definition/loss, or "the act of losing possession," *Loss*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/loss.

Taken together, then, "direct physical loss" may mean an "actual loss of possession," the "actual loss of something," or the "loss of something material, as opposed to mental or spiritual." Consequently, the loss of a business, or some aspect thereof, and the temporary loss of possession of one's property, real or personal, both qualify as "direct physical losses." Given the existence of competing possible meanings, and to the extent there exists any ambiguity in defining the term, the Court must "construe[] [the Policies] liberally in favor of coverage of the insured and strictly against the insurer." *Lubell & Rosen LLC v. Sentinel Ins. Co., Ltd.*, No. 0:16-CV-60429-WPD, 2016 WL 8739330, at *2 (S.D. Fla. June 10, 2016); *see Rockhill Ins. Co. v. Northfield Ins. Co.*, 297 F. Supp. 3d 1279, 1283–84 (M.D. Fla. 2017) ("Florida interprets insuring or coverage clauses in the broadest possible manner to provide the greatest extent of coverage.").[13]

### 2. Defendants' cited authority does not require structural damage.

Defendants' cited authority does nothing to alter this conclusion. In *Mama Jo's, Inc. v. Sparta Insurance Co.*, the court held on summary judgment that cleaning costs were not "direct physical losses" under the insured's policy, particularly because the covered property had *not* been rendered "uninhabitable" or "unusable." No. 17-CV-23362-KMM, 2018 WL 3412974, at *9 (S.D. Fla. June 11, 2018) ("[T]he restaurant remained open every day, customers were always able to access the restaurant, and there is no evidence that dust had an impact on the operation other than

---

[13] Generally, where a contractual provision is ambiguous, the court "may not engage in contract interpretation . . . , as these arguments are more appropriate for summary judgment." Order [D.E. 19] at 7, *Circuitronix, LLC v. Shenzen Kinwong Elec. Co., Ltd.*, No. 20-cv-22114 (S.D. Fla.) (citations and internal quotations omitted).
.

requiring daily cleaning."). *Mama Jo*'s is consistent with *Azalea*, *Three Palms Pointe*, *Maspons*, and other authorities in reasoning that "direct physical loss of" property arises where the property becomes uninhabitable or unusable, even though it remains structurally unaltered. *See* pp. 14-15 & n.8, *supra*. Here, Plaintiffs' property was deemed "unusable" both by government order and as a result of the COVID-19 pandemic. *See* FAC ¶¶ 23-27, 45-48.

Defendants focus on *Mama Jo*'s holding that "[a] direct physical loss contemplates an actual change in insured property then in a satisfactory state, occasioned by accident or other fortuitous event directly upon the property causing it to become unsatisfactory for future use **_or_** requiring that repairs be made to make it so." Motion at 13 (emphasis added). This language does not require structural or physical harm. Rather, it simply requires that a fortuitous event render the covered property "unsatisfactory for future use." *Id.* Here, without suffering structural harm, Plaintiffs experienced a "change in insured property" (they lost the use of their properties for their intended function), "occasioned by fortuitous events" (a pandemic and emergency orders), which caused the properties to "become unsatisfactory for future use" (Plaintiffs could not operate their restaurants because customers could not gather there). *Mama Jo's* does not preclude recovery here.

In *Social Life Magazine, Inc. v. Sentinel Insurance Co., Ltd.*, the court applied New York law at a hearing on a proposed order to show cause involving the plaintiff's request for injunctive relief, and focused on whether the coronavirus itself can cause physical damage to covered property, rather than on "direct physical loss." *See* Motion Ex. N. Florida law applies here, and Florida courts—and courts elsewhere—have interpreted "direct physical loss" to include the loss of property for its intended use. *See* pp. 14-15 & n.8, *supra* (citing, *inter alia*, *Three Palms Pointe*, 250 F. Supp. 2d at 1364 (citing *Azalea* "for the proposition that under Florida law 'direct physical loss' includes more than losses that harm the structure of the covered property.")).

Defendants' reliance on *Gavrilides Management Co. v. Michigan Insurance Co.*, No. 20-000258-CB (Mich. Cir. Ct. July 1, 2020), is similarly misplaced. First, as Defendants here note, the Michigan Circuit Court based its ruling on the notion that "physical loss or damage" requires structural and tangible alteration to the property. *See* Motion at 14, 16. Indeed, counsel for the defendant insureds in that case repeatedly referred to a purported requirement under Michigan law that damage be "structural" and "tangible." *See* Motion Ex. O at 9, 10, 20, 21. Whatever the merits of those arguments and legal standards as a matter of Michigan law, they have been expressly rejected by courts in Florida and other jurisdictions. *See* pp. 14-15 & n.8, *supra*. Finally, *Gavrilides*, like virtually all the cases on which Defendants rely, was not decided at the pleading stage, but rather on a motion for summary disposition. *See* Motion Ex. O at 2.

Finally, In *Rockhill Insurance Co. v. Northfield Insurance Co.*, the court did not address the question presented here. It simply held that the entire phrase "direct physical loss or damage" applied to property, and not to cover monetary damages awarded in a wrongful death suit. *See* 297 F. Supp. 3d 1279, 1286-87 (M.D. Fla. 2017).

Each of these cases is inapposite, and none precludes recovery here.

### 3. The definition of "period of restoration" does not limit Plaintiffs' coverage.

Defendants attempt to define "period of restoration" narrowly to support their position that the Policies only cover physical damage, but their reading views the term in isolation and out of context of the entire policy. This approach is prohibited by Florida law. *See State Farm Mut. Auto. Ins. Co. v. Mashburn*, 15 So. 3d 701, 704 (Fla. 1st DCA 2009) ("[A] single policy provision should not be read in isolation and out of context, for the contract is to be construed according to its entire terms, as set forth in the policy and amplified by the policy application, endorsements, or riders.") (citing, *inter alia*, *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 166 (Fla. 2003)).

The Policies define the "period of restoration" as the time beginning "72 hours after the time of direct physical loss or damage" and ending on the earlier of "[t]he date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality, or . . . [t]he date when business is resumed at a new permanent location." *See* FAC ¶ 36; Motion Ex. B at 45. Defendants define "repair," "replace," and "rebuild" narrowly, and conclude that covered losses "must involve some physical damage to covered property that needs to be repaired." Motion at 17. "Repair," however, means not only to fix what is broken, but also "to restore to a sound or healthy state,"[14] to "put right (a damaged relationship or unwelcome situation),"[15] "to renew; restore; revive,"[16] and "to amend; set right; remedy."[17] *See also Repair*, Merriam-Webster,    https://www.merriam-webster.com/thesaurus/repair    (listing    "restore," "revitalize," "resuscitate," as synonyms for repair); *Repair*, Thesaurus, https://www.thesaurus.com/browse/repair (listing "restore," "recover," "rectify," and "retrieve" as synonyms for "repair"). These definitions accord with the plain meaning of the term "period of *restoration*." "If the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the [other] limiting coverage, the insurance policy is considered ambiguous . . . [and] should be construed liberally in favor of coverage of the insured and strictly against the insurer." *Lubell & Rosen LLC*, 2016 WL 8739330, at *2. Because Defendants have not defined "repair" in the Policies, they "cannot take the position that there should be a narrow, restrictive interpretation of the coverage provided." *State Farm Fire & Cas.*

---

[14] *Repair*, Merriam-Webster, https://www.merriam-webster.com/dictionary/repair.

[15]  *Repair*, Oxford English Dictionary, https://www.lexico.com/en/definition/repair.

[16] *Repair*, Collins Dictionary, https://www.collinsdictionary.com/us/dictionary/english/repair.

[17]  *Id.*

*Co. v. CTC Dev. Corp.*, 720 So. 2d 1072, 1076 (Fla. 1998) (internal quotations and citation omitted).

Applying this broader definition of "repair," the Policies provide coverage for business income losses beginning 72 hours after the time when Plaintiffs lost the intended use of their restaurants and ending when their functionality is restored or recovered. This construction accords with a holistic reading of the Policies, which define "property" to include tangible as well as intangible assets. The "property" covered by the Policies includes accounts receivable, "services furnished or arranged by you on the property of others," certain electronic data, and "information on valuable papers." *See, e.g.,* Motion Ex. B at 21, 26, 28, 62. An insured could lose business income as a result of the "direct physical loss of or damage to" such intangibles, but accounts receivable and business services, for example, cannot be "repaired," "rebuilt," or "replaced" in the most restrictive sense. They can, however, be restored or recovered. To be sure, Plaintiffs' Policies provide that Defendants "will pay to replace *or restore* data which has been destroyed or corrupted by a Covered Cause of Loss." *See id.* at 26 (emphasis added); *see also id.* at 28 ("You may extend the insurance that applies to Your Business Personal Property to apply to the cost to *replace or restore* the lost information on valuable papers and records for which duplicates do not exist.") (emphasis added). In the event of data corruption, then, Business Income losses would presumably terminate when the data was restored. That being the case, the broader sense given "repair—to "restore," "resuscitate," "set right"—must be used here. *See State Farm Mut. Auto. Ins. Co. v. Mashburn*, 15 So. 3d 701, 704 (Fla. 1st DCA 2009) ("[A] single policy provision should not be read in isolation and out of context, for the contract is to be construed according to its entire terms, as set forth in the policy and amplified by the policy application, endorsements, or riders.") (citing, *inter alia*, *Swire*, 845 So. 2d at 166).

22

Plaintiffs have suffered a "direct physical loss of" the covered properties.

**B. Plaintiffs' Losses Are Not Excluded Losses.**

Plaintiffs' Policies cover all direct physical losses not expressly excluded from coverage. *See* Motion Ex. B at 49. "[T]he insurer is held responsible for clearly setting forth what damages are excluded from coverage under the terms of the policy." *Fayad*, 899 So. 2d at 1086. "'If the insurer fails in the duty of clarity by drafting an exclusion that is capable of being fairly and reasonably read both for and against coverage, the exclusionary clause will be construed in favor of coverage.'" *Geovera Specialty Ins. Co. v. House*, No. 08-14204-CIV, 2009 WL 10668520, at *6 (S.D. Fla. Sept. 11, 2009) (quoting *State Farm Fire & Cas. Ins. Co. v. Deni Assocs. of Fla., Inc.*, 678 So. 2d 397, 401 (Fla. 4th DCA 1996), *aff'd*, 711 So. 2d 1135 (Fla. 1998)). In fact, "'[e]xclusionary clauses must be construed more strictly than coverage clauses.'" *Dwyer v. Globe Life & Accident Ins. Co.*, No. 2:19-CV-14071-CV, 2019 WL 8014500, at *5 (S.D. Fla. Nov. 25, 2019), *report and recommendation adopted*, No. 2:19-CV-14071, 2019 WL 8014478 (S.D. Fla. Dec. 18, 2019) (quoting *Blue Cross & Blue Shield of Fla., Inc. v. Steck*, 778 So. 2d 374, 376 (Fla. 2d DCA 2001).

Had Defendants intended to exclude global pandemics or governmental orders addressing the same from coverage, they could have done so in clear and specific terms. *See Fayad*, 899 So. 2d at 1090 ("If Clarendon intended to exclude damage from earth movement caused by man-made events from coverage as it now contends, it could have done so clearly and unambiguously."). To be sure, the Policies exclude catastrophic events *like* pandemics from coverage—including losses

arising from wars and nuclear radiation—but Defendants chose not to exclude losses arising from pandemics, quarantines, or emergency closures arising from such public health emergencies.[18]

Seeking to remedy their omission retroactively, Defendants seek to shoehorn Plaintiffs' losses to fit three exclusions in the Policies: a "microorganism" exclusion and two "pollution" exclusions. *See* Motion at 22-30. Defendants are bound to demonstrate that these provisions unequivocally exclude coverage for Plaintiffs' losses. *See Fayad*, *supra.* Because none of the cited exclusions clearly precludes Plaintiffs' claims—a virus is not a "microorganism," a "pollutant," "seepage" or a "contaminant" by any accepted definition—the Court must read the exclusion "strongly against the insurer." *Dwyer*, 2019 WL 8014500, at *5.

**1.  The Microorganism Exclusion Cannot Be Read to Deny Coverage.**

The Microorganism Exclusion in the Policies provides, in pertinent part:

This policy does not insure any loss, damage, claim, cost, expense or other sum directly or indirectly arising out of or relating to:

mold, mildew, fungus, spores or other micro-organism of any type, nature, or description, including but not limited to any substance whose presence poses an actual or potential threat to human health.

Motion Ex. B at 10.

The Policies do not define "microorganism." *See id.* Accordingly, the common definition applies. *See Gomez v. Allied Professionals Ins. Co.*, No. 19-CV-24994, 2020 WL 2197865, at *7 (S.D. Fla. May 6, 2020) ("[W]hen a term in an insurance policy is undefined, it should be given its plain and ordinary meaning, and courts may look to legal and non-legal dictionary definitions

---

[18]  As explained above, other insurance policies do expressly exclude losses arising from viruses. *See, e.g., Joseph Oliver Constr., LLC v. Utica First Ins. Co.*, No. CV 19-4352-KSM, 2020 WL 3791564, at *1 (E.D. Pa. July 7, 2020) (setting forth virus exclusion); *Travelers Indem. Co. of Am. v. L.H.R. Farms, Inc.*, No. 2:09-CV-121-WCO, 2010 WL 11603153, at *1 (N.D. Ga. May 18, 2010) (noting that defendant insurer defended against coverage by raising policy's "virus and bacteria exclusion").

24

to determine such a meaning.") (quoting *Gov't Employees Ins. Co. v. Macedo*, 228 So. 3d 1111, 1113 (Fla. 2017)). "Microorganism" is commonly defined as "a living thing that on its own is too small to be seen without a microscope[,]"[19] or "an organism (such as bacterium or protozoan) of microscopic or ultramicroscopic size."[20] The weight of scientific authority holds that viruses are not living things, and therefore not microorganisms. *See, e.g.,* Laura Geggel, *Are Viruses Alive?*, Live Science, Feb. 25, 2017, https://www.livescience.com/58018-are-viruses-alive.html ("Something that is not alive, such as a virus, does not have self-generated or self-sustaining actions."); *What Are Microorganisms?*, University of Bergen Centre for Geobiology, Jan. 11, 2010 ("Microorganisms can be bacteria, fungi, archaea, or protists. The term microorganisms does not include viruses and prions, which are generally classified as non-living.")[21]; Luis P. Villarreal, *Are Viruses Alive?*, Scientific American, Aug. 8, 2008, https://www.scientificamerican.com/article/are-viruses-alive-2004/ (Viruses "have a certain potential, which can be snuffed out, but they do not attain the more autonomous state of life.").[22]

---

[19]     *Microorganism*, Cambridge Dictionary, available at https://dictionary.cambridge.org/us/dictionary/english/microorganism.

[20]     *Microorganism*, Merriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/microorganism.

[21]     Available at https://www.uib.no/en/geobio/56846/what-are-microorganisms#:~:text=The%20study%20of%20microorganisms%20is,generally%20classified%20as%20non%2Dliving.&text=Viruses%20are%20considered%20to%20be,between%20living%20and%20non%2Dliving.

[22]     *See also* Taylor McNeil, *What Are Viruses and How Do They Work?*, Tufts University (Apr. 3, 2020), https://now.tufts.edu/articles/what-are-viruses-and-how-do-they-work (interview with Tufts microbiology professor John Coffin explaining that "[v]iruses are completely different from bacteria" because they are not living things); Amanda Heidt, *Giant viruses aren't alive. So why have they stolen the genes essential for life?*, Science (Apr. 16, 2020), https://www.sciencemag.org/news/2020/04/giant-viruses-aren-t-alive-so-why-have-they-stolen-genes-essential-life.

Defendants' authority is inapposite. Defendants rely on three opinions, all of which involved losses caused by bacteria, which, unlike viruses, are commonly defined as microorganisms.[23] *See Certain Underwriters at Lloyd's London v. Creagh*, No. CIV.A. 12-571, 2013 WL 3213345, at *3 (E.D. Pa. June 26, 2013), *aff'd sub nom. Certain Underwriters at Lloyds of London Subscribing to Policy No. SMP3791 v. Creagh*, 563 F. App'x 209 (3d Cir. 2014) ("For the policy exclusion to apply in this case, plaintiff must produce evidence that bacteria or other microorganisms were present in Arthur Doud's bodily fluids, and that they caused the damages at issue."); *Certain Underwriters at Lloyd's, London Subscribing to Policy No. W15F03160301 v. Houligan's Pub & Club, Inc.*, No. 2017 31808 CICI, 2019 WL 5611557, at *11 (Fla. Cir. Ct. Oct. 24, 2019) ("The reasoning of *Creagh* applies with equal force in the instant case. E. coli and enterococcus are both bacteria . . . As *Creagh* points out, bacteria are microorganisms.") (internal citation omitted). Viruses are not bacteria. *See, e.g.,* "'Virus' vs. 'Bacteria': the key differences between two common pathogens," https://www.merriam-webster.com/words-at-play/virus-vs-bacteria-difference ("Viruses are not living organisms, bacteria are."); "Bacterial v. viral infections: How do they differ?", Mayo Clinic, available at https://www.mayoclinic.org/diseases-conditions/infectious-diseases/expert-answers/infectious-disease/faq-20058098 (explaining that bacterial infections result when single-celled organisms (bacteria) make a home in the intestines, whereas viruses require living hosts to multiply). Thus, Defendants' authority does not apply.

---

[23] *Microorganism*, MERRIAM-WEBSTER DICTIONARY, available at https://www.merriam-webster.com/dictionary/microorganism (defining microorganism as "an organism (*such as bacterium* or protozoan) of microscopic or ultramicroscopic size") (emphasis added); *Bacteria*, MERRIAM-WEBSTER DICTIONARY, *available at* merriam-webster.com/dictionary/bacteria ("Microscopic single-celled organisms lacking a distinct nucleus are known as *bacteria*.") (emphasis in original).

Defendants' authority also suggests that a microorganism must be present on the insured's property for the Microorganism Exclusion to preclude coverage. *See Creagh*, 2013 WL 3213345, at *1 (involving the decomposition of a dead body in an apartment owned by the defendants); *Houligan's Pub*, 2019 WL 5611557, at *1 (involving a business that was flooded with sewage). The same requirement is apparent in the Policies' plain language: the Microorganism Exclusion addresses microorganisms "of any type, nature, or description, including but not limited to any substance whose *presence* poses an actual or potential threat to human health." *See* p. 24, *supra* (emphasis added). Plaintiffs' claims do not arise from the presence of the novel coronavirus or any microorganism in their restaurants. Instead, Plaintiffs claim losses arising from the global outbreak of COVID-19, and the corresponding public health emergency, and from government orders suspending their business operations as a result of the pandemic. *See, e.g.*, FAC ¶¶ 48, 51. Thus, even if the coronavirus were a microorganism—and it is not—the Policies would not exclude Plaintiffs' losses.

## 2. The Policies' Pollution Exclusions Cannot Be Read to Deny Coverage.

Nor are Plaintiffs' losses precluded by the Policies' Pollution Exclusions. Defendants argue that two "pollution" exclusions bar recovery for Plaintiffs' business interruption losses. The first excludes, in relevant part, losses, damage, costs, and expenses arising from "any kind or seepage or any kind or pollution and/or contamination, or threat thereof, whether or not caused by or resulting from a Peril insured[.]"[24] Motion Ex. B at 13 (Seepage and/or Pollution and/or

---

[24] The Policies define "any kind of seepage or any kind or pollution and/or contamination" to include "seepage of, or pollution and/or contamination by, anything, including but not limited to, any material designated as "hazardous material" by the United States Environmental Protection Agency or as a 'hazardous material' by the United States Department of Transportation" or " any substance designated or defined as toxic, dangerous, hazardous or deleterious to persons or the environment under any other Federal, State, Provincial, Municipal or other law, ordinance or regulation" and "the  presence, existence, or release of anything which endangers or threatens to

Contamination Exclusion USA & Canada).

Elsewhere, the Policies provide that Defendants will not pay for loss or damage resulting from:

> Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

*Id.* at 52.[25]

Defendant's arguments fail first and foremost because Plaintiffs' losses do not arise from the pollution or contamination of the covered properties. That is, their claims do not arise from the "presence, existence or release" of a pollutant, seepage, a contaminant, or any other type of "substance" in their restaurants or elsewhere. Plaintiffs allege instead that state and county emergency orders and a global pandemic forced them to suspend their business operations. *See e.g.*, FAC ¶¶ 48, 51.

Nor do Plaintiffs' claims arise indirectly from pollution or contamination. The county and state emergency orders were not issued to address the contamination of real or personal property; they were issued "to protect human life and health," promote public safety, "to avoid risk of COVID-19 infection for the residents of the County," and "to preserve ... the viability of the economy." *See* Motion Exs. E-K. Similarly, the pandemic did not suspend Plaintiffs' business operations because their premises were contaminated. The pandemic suspended operations because customers and employees were advised to socially distance themselves from others and stay at home in the interest of public safety. *See* FAC ¶¶ 26, 27, 52.

---

endanger the health, safety or welfare of persons or the environment." *Id.* at 14.

[25] The Policies define "pollutants" to include "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." *Id.* at 36.

Courts considering these pollution exclusions have applied them where a pollutant or contaminant pervades or attaches to the property in question. In *Nova*, for example, the court held that "living organisms," "microbial populations," "microbial contaminants," and "indoor allergens" present on the covered property were excluded causes of loss, as the plaintiffs had alleged that "these substances traveled from surfaces in the building, through the air, and came in contact with the plaintiffs, thereby causing physical injury, sickness, disease, and/or physical handicap." *Nova Cas. Co. v. Waserstein*, 424 F. Supp. 2d 1325, 1334 (S.D. Fla. 2006). That is, the contaminants *originated* on and spread throughout the covered property, causing the plaintiffs' losses. *See id.*

The same was true in *First Specialty*. There, a viral contaminant infecting the water in a swimming pool owned by the insured injured a guest on the property who swallowed the water. *See First Specialty Ins. Corp. v. GRS Mgmt. Assocs., Inc.*, No. 08-81356-CIV, 2009 WL 2524613, at *1 (S.D. Fla. Aug. 17, 2009). The court held that the insurance company did not have a duty to defend the insured property owner against the swimmer's claim because the substance originating in the insured's swimming pool was properly defined as a contaminant. *See id.*

And in *Epic Hotel*, this Court was clear: whether the pollution exclusions at issue applied "depend[ed] on two questions: whether the exclusions appl[ied] to the Legionnaire bacteria that allegedly contaminated the [a hotel's] water supply and whether the claims against the insureds ar[o]se from *the presence of* Legionnaire bacteria." *James River Ins. Co. v. Epic Hotel, LLC*, No. 11-CV-24292-UU, 2013 WL 12085984, at *4 (S.D. Fla. Jan. 9, 2013) (emphasis added).

Here, Plaintiffs allege that they suffered business income losses due to government orders requiring them to restrict or cease their operations, and because a global pandemic and related public safety hazard—the congregation of people in groups of ten or more—forced a prolonged

29

business suspension. FAC ¶¶ 26, 27, 48, 52. Though the COVID-19 virus was the subject of the government orders, it did not infect Plaintiffs' restaurants' premises, nor did it threaten to do so. Accordingly, the Policies' pollution exclusions do not bar Plaintiffs' claims.

### C. Plaintiffs Are Entitled to Additional Coverage for Business Income Losses Arising from Civil Authority Orders.

The Policies provide additional coverage for business income losses caused by civil authority orders taken in response to dangerous physical conditions, which can be triggered even when the standard business interruption coverage is not. The Policies' additional coverage provides:

> When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:
>
> (3) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and
>
> (4) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Plaintiffs' Policies include Florida Changes, which waive the one-mile radius requirement for real property located in Florida.[26] *See* Motion Ex. B at 73 ("With respect to described premises located in Florida, such one-mile radius does not apply.").

The Policies do not define "damage" or "property damage." Though "damage" and "property damage" certainly include structural damage, Defendants have not restricted them to

---

[26] The Florida Changes also shorten the coverage period from four to three weeks. *See id.*

mean *only* structural damage. As observed above, "damage' is commonly understood to mean "injury or harm." *See* n.10, *supra*. Had Defendants intended to limit "damage" to structural damage, they could have drafted the civil authority provision to require "structural damage to other property." *See* p. 15, *supra*. To the extent the term is ambiguous, the Court must construe the Policies strictly against the insurer. *Lubell & Rosen, LLC*, 2016 WL 8739330, at *2.

Plaintiffs allege that the COVID-19 outbreak has been declared a pandemic, which has caused the novel coronavirus to spread throughout the county and the state, infecting residents who then carried the virus into the community. *See* FAC ¶¶ 23, 24, 28, 45-48. The COVID-19 outbreak caused physical damage to property throughout Miami-Dade County—residents carried the novel coronavirus everywhere, and it adhered to surfaces inside and outside of homes and businesses. *See id.* ¶ 25 & n.6. In order to curtail the spread of the virus, which was already present and created a dangerous physical condition in Miami-Dade County,[27] Mayor Gimenez issued emergency orders which prohibited access to Plaintiffs' restaurants, as well as other non-essential businesses, and caused Plaintiffs to lose business income. For example, on March 17, 2020, Miami-Dade County Mayor Carlos Gimenez issued Emergency Order 03-20, which required "[a]ll restaurants, bars, taverns, clubs," and similar establishments with seating for more than eight people to "close on-premises service of customers." Motion Ex. G.

Defendants argue that civil authority coverage does not apply because the government orders did not require Plaintiffs to cease all operations; they were permitted to continue takeout

---

[27] The first recorded case of the virus in Miami-Dade County was recorded on March 11, 2020, and Mayor Gimenez declared a state of emergency in direct response to this report. *See* https://miami.cbslocal.com/2020/03/11/first-confirmed-case-coronavirus-miami-dade/. The Court may take judicial notice of this fact here because it is "a fact that is not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

and delivery service. *See* Motion at 19-21. But the Policies define a "suspension" of business operations as "[t]he slowdown or cessation of your business activities." FAC ¶ 35. The emergency orders expressly required Plaintiffs to close their premises to customers, which "slowed" their business. *See id.*

Defendants authority does not alter this analysis. In *Southern Hospitality v. Zurich American Insurance Co.*, 393 F.3d 1137 (10th Cir. 2004), the court denied coverage because the civil authority order in question did not expressly prohibit customer access to the plaintiff's hotel. *See id.* at 1140 ("The FAA order prohibited access to airplane flights; it did not prohibit access to hotel operations."). Similarly, in *Kean, Miller, Hawthorne, D'Armond McCowan & Jarman, LLP v. Nat'l Fire Ins. Co. of Hartford*, No. CIV.A. 06-770-C, 2007 WL 2489711 (M.D. La. Aug. 29, 2007), the court denied coverage because the civil authority orders in question advised residents to "stay off the streets," but "did not actually 'prohibit access' to the insured premises." *Id.* at *4.[28] Here, by contrast, state and county orders expressly prohibited customer access to Plaintiffs' restaurants and similar businesses throughout Miami-Dade County. *See* FAC ¶¶ 45, 46; Motion Exs. E-K.

Defendants next argue that the state and county orders "were not issued 'in response' to dangerous physical conditions resulting from physical property damage to nearby property." Motion at 21-22. This is not what their civil authority coverage requires. It requires that the orders be issued "in response to dangerous physical conditions resulting from the damage *or continuation*

---

[28] Defendants' remaining authority suffers from similar flaws. *See, e.g., By Dev., Inc. v. United Fire & Cas. Co.*, No. CIV. 04-5116, 2006 WL 694991, at *5 (D.S.D. Mar. 14, 2006) (coverage denied because road closures and evacuation order prohibited access to property was prohibited for less than 72-hour minimum required for coverage); *54th St. Ltd. Partners, L.P. v. Fid. & Guar. Ins. Co.*, 306 A.D.2d 67, 67 (N.Y. App. Div. 2003) ("[A]lthough vehicular and pedestrian traffic in the area was diverted, access to the restaurant was not denied[.]").

*of the Covered Cause of Loss that caused the damage.*" Motion Ex. B at 38 of 78 (emphasis added). That is, coverage attaches if the emergency orders issued in response to dangerous physical conditions caused by the continuation of the COVID-19 pandemic.

Plaintiffs also satisfy the requirement that the subject civil authority orders issue as a result of damage to other property caused by the pandemic. The novel coronavirus was present in Miami-Dade County as early as March 11, 2020. *See* n.27, *supra*. The virus damaged property within the County—it transmitted easily and rapidly where people gathered both from surface-to-person and person-to-person. *See* FAC ¶ 25. Mayor Gimenez issued the emergency orders that prohibited access to Plaintiffs' properties because the virus was already present in the County and among its citizens. *See, e.g., id.* ¶¶ 28, 45, 46; Motion Exs. E, G. Regardless, causation is a question of fact not properly resolved on a motion to dismiss. *USA Entm't Grp., Inc. v. Israel*, No. 16-CV-60467, 2017 WL 4553441, at *4 (S.D. Fla. Oct. 12, 2017).

The opinions relied on by Defendants involved different, and often stricter, civil authority provisions which expressly excluded the plaintiffs' losses. *See United Airlines, Inc. v. Ins. Co. of State of Pa.*, 385 F. Supp. 2d 343, 345 (S.D.N.Y. 2005) (coverage denied where policy required "damage or destruction to adjacent property" because Pentagon, which was damaged in 9/11 attack, was not adjacent to Reagan Airport and closures were not "direct result of" terrorist attack); *City of Chicago v. Factory Mut. Ins. Co.*, No. 02 C 7023, 2004 WL 549447, at *2 (N.D. Ill. Mar. 18, 2004) (coverage denied under Ingress/Egress provision which covered business interruption losses sustained "due to prevention of ingress to or egress from" the covered property, resulting from "physical damage of the type insured against," where closing of Chicago airports resulted from FAA grounding order rather than terrorist attacks); *Syufy Enters. v. Home Ins. Co. of Ind.*, No. 94-0756 FMS, 1995 WL 129229, at *1 (N.D. Cal. Mar. 21, 1995) (coverage denied where

plaintiffs had not alleged that neighboring property was damaged or destroyed where policy required that civil authority orders be issued "as a direct result of damage to or destruction of property adjacent to the premises").

Plaintiffs are entitled to additional coverage for losses arising from the County's civil authority orders. *See, e.g., Studio 417*, 2020 WL 4692385, at \*7.

## II.   PLAINTIFFS HAVE STATED CLAIMS ON BEHALF OF A PUTATIVE CLASS.

Defendants ask this Court to dismiss Plaintiffs' case on the ground that the Court cannot certify a class as a matter of law. *See* Motion at 30-39. Dismissal on this ground is "an extreme remedy." *Randy Rosenberg, D.C., P.A. v. GEICO Gen. Ins. Co.*, No. 19-CV-61422, 2019 WL 6828150, at \*6 (S.D. Fla. Dec. 13, 2019). Accordingly, "Defendants . . . have the burden of demonstrating from the face of plaintiffs' complaint that it will be *impossible* to certify the classes alleged by the plaintiffs regardless of the facts the plaintiffs may be able to prove." *Romano v. Motorola, Inc.*, No. 07-CIV-60517, 2007 WL 4199781, at \*2 (S.D. Fla. Nov. 26, 2007) (citation and internal quotations omitted; emphasis added).

Class certification "usually should be predicated on more information than the complaint itself affords. The court may, and often does, permit discovery relating to the issues involved in maintainability, and a preliminary evidentiary hearing may be appropriate or essential[.]'" *Herrera v. JFK Med. Ctr. Ltd. P'ship*, 648 F. App'x 930, 934 (11th Cir. 2016) (quoting *Huff v. N.D. Cass Co. of Ala.*, 485 F.2d 710, 713 (5th Cir.1973) (en banc)). Indeed, the law instructs federal courts to undertake a "rigorous analysis" before granting or denying class certification; dismissal of a plaintiffs' class case before discovery has been taken forecloses such an analysis. *See MSPA Claims I, LLC v. Century Sur. Co.*, No. 16-20752-CIV, 2017 WL 998282, at \*5 (S.D. Fla. Mar. 15, 2017) ("Because the evidentiary record has not yet been developed, the Court cannot yet make

a rigorous analysis. Therefore, the motion to dismiss the class allegations is denied without prejudice.").

Accordingly, pre-discovery, Eleventh Circuit courts consistently hold the dismissal of class allegations to be premature. *See, e.g., Herrera*, 648 F. App'x at 936 (holding that district court abused discretion and "should have allowed limited discovery instead of striking the class allegations based solely on the face of the complaint"); *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1309 (11th Cir. 2008) ("[P]recedent . . . counsels that the parties' pleadings alone are often not sufficient to establish whether class certification is proper, and the district court will need to go beyond the pleadings and permit some discovery and/or an evidentiary hearing to determine whether a class may be certified."); *Bartholomew v. Lowe's Home Ctrs., LLC*, No. 219CV695FTM38MRM, 2020 WL 1677289, at *3 (M.D. Fla. Apr. 6, 2020) ("[C]hallenges to the maintenance of a class are more appropriate after some discovery or on a motion for class certification.").

Plaintiffs' claims present two critical questions common to all class members: whether the COVID-19 pandemic and related mandated business closures are Covered Causes of Loss, and if so, whether these Covered Causes of Loss caused a "direct physical loss of or damage to" covered property.[29] *See* FAC ¶ 69. Nevertheless, Defendants move to dismiss Plaintiffs' class allegations pre-discovery on three grounds. They argue that (A) Plaintiffs are not members of the class defined in the FAC because class members' policies include "non-standard forms" and Plaintiffs' losses are excluded by the microorganism and pollution exclusions; (B) Plaintiffs cannot satisfy Rule 23(b)(2) because declaratory relief is not the predominant relief sought; and (C) Plaintiffs cannot

---

[29] To be sure, all motions to dismiss filed in the various class and individual actions against the major insurance companies address these questions.

satisfy Rule 23(b)(3) because variations in state law will render class litigation unmanageable. None of Defendants' positions has merit.

### A.  Plaintiffs' Claims Are Typical of Those of the Proposed Class.

Defendants argue that Plaintiffs are inadequate class representatives because the class policies "have individual endorsements, making them non-standard, and exclude coverage for pandemics caused by microorganisms." Motion at 32-34. Plaintiffs have already addressed the latter concern: their Policies' microorganism and pollution exclusions do not exclude coverage for pandemics. *See* Section I.B.1, *supra*. Accordingly, Plaintiffs can represent a class including insureds holding policies without these exclusions. *See Randy Rosenberg*, 2019 WL 6828150, at *4 ("[T]he typicality requirement is permissive: representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical.").

Defendants cite *Epic Hotel* for the proposition that "[t]he Pollution Exclusions preclude coverage for damages caused by contamination, which includes bacterial pandemics." Motion at 34. However, *Epic Hotel* did not involve a bacterial pandemic—it addressed the contamination of one hotel's water supply by the bacteria associated with Legionnaire's Disease. *See* 2013 WL 12085984, at *1. *Epic Hotel*, that is, involved the contamination of property on the hotel's premises, and not a global pandemic occurring outside the property that caused a suspension of the hotel's business.

Whether other endorsements or exclusions might set class members apart from their proposed representatives is an evidentiary question that cannot be resolved at this stage. Class discovery will reveal whether material variances among absent class members' policies exist. The Court should therefore decide whether any such variances render Plaintiffs' claims atypical at class certification. *See, e.g., Randy Rosenberg*, 2019 WL 6828150, at *8 ("[I]t is premature to make a

determination as to the typicality and predominance of the proposed class before Plaintiff has had the benefit of discovery to establish and substantiate each element required for class certification.").

Moreover, to the extent that absent class members have exclusions or endorsements in their policies which preclude coverage, Plaintiffs can amend the class definition to exclude those members. *See, e.g., Williams v. Wells Fargo Bank, N.A.*, 280 F.R.D. 665, 675 (S.D. Fla. 2012), *modified on reconsideration sub nom. Williams v. Wells Fargo Fin. Servs., Inc.*, No. 11-21233-CIV, 2012 WL 12865256 (S.D. Fla. July 25, 2012) (certifying class of mortgagors with force-placed insurance, but excluding from class those with foreclosure and other judgments against them, those in short sale, and those offering deeds in lieu of foreclosure, among others).

Plaintiffs have pled typicality sufficiently to survive a motion to dismiss.

**B.  Plaintiffs' Class Allegations Satisfy Rule 23(b)(2).**

Defendants next argue that Plaintiffs cannot satisfy Rule 23(b)(2) as a matter of law because (1) there is no uniform policy Defendants have issued to all class members, and (2) declaratory relief is not Plaintiffs' "primary remedy." Motion at 35-36. Neither argument should persuade the Court. First, there is a standard policy form that Defendants have issued to all putative class members. Plaintiffs define the class to include "all entities with insured property which have entered into standard all-risk commercial property insurance policies with the Underwriter Defendants." FAC ¶ 61. Insureds without the standard forms—identified by prefixes CP 0010 and CP 00 30, *id.* ¶ 31—would not be class members. Beyond that, the existence and relevance of distinctions among the standard policies in the form of applicable exclusions or endorsements are evidentiary questions that the Court will consider at class certification. *See* Section II.A, *supra*.

Second, Defendants' argument that Plaintiffs can only seek incidental damages in a Rule 23(b)(2) class action has no bearing here, because Plaintiffs seek certification of their claims for

monetary damages under Rule 23(b)(3). *See* FAC ¶ 70. Claims for compensatory damages are precluded in Rule 23(b)(2) class actions because (b)(2) certification does not afford class members the same protections allowed under Rule 23(b)(3), including the option to opt in or out of the class and pursue monetary damages in an individual case. *See, e.g., Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1156 (11th Cir. 1983) ("Unlike members of (b)(3) classes, class members of actions certified under (b)(2) ordinarily are not entitled to individual notice and typically do not have the right to opt out of the lawsuit."). However, where, as here, Plaintiffs seek to certify classes under Rules 23(b)(2) and (b)(3), the court may certify both classes. *See, e.g., Fabricant v. Sears Roebuck*, 202 F.R.D. 310, 315 (S.D. Fla. 2001) ("A court . . . may certify multiple classes: a class for injunctive relief under Rule 23(b)(2) and a damages class under Rule 23(b)(3)) (citing *Davis v. S. Bell Tel. & Tel. Co.*, No. 89-cv-2839, 1993 WL 593999, at \*7 (S.D. Fla. Dec. 23, 1993) ("Nothing in the language of Rule 23 precludes certification of both an injunctive class and a damages class in the same action. In fact, where injunctive relief and damages are both important components of the relief requested, court[s] have regularly certified an injunctive class under Rule 23(b)(2) and a damages class under Rule 23(b)(3) in the same action."); *see also, e.g., Jermyn v. Best Buy Stores, L.P.*, 276 F.R.D. 167, 174 (S.D.N.Y. 2011) (holding that "incidental damages" rule applies only where monetary relief is sought for a 23(b)(2) class, and certifying both a 23(b)(2) injunctive class and a 23(b)(3) class).

Regardless, any determination about whether Plaintiffs' monetary damages are incidental to the requested declaratory relief would be premature at this stage of litigation. *See Desmond v. Citimortgage, Inc.*, No. 1:12-CV-23088, 2015 WL 845571, at \*2 (S.D. Fla. Feb. 25, 2015). It is unclear at this juncture what form this action will take when certification is at issue—Plaintiffs may have amended their Complaint or class definition, having had the benefit of discovery, and they or the Court may redefine their claims and remedies. *See, e .g., Martorella v. Deutsche Bank*

*Nat. Tr. Co.*, 931 F. Supp. 2d 1218, 1228 (S.D. Fla. 2013) (declining to dismiss class allegations because "'[t]he shape and form of a class action evolves only through the process of discovery, and it is premature to draw such a conclusion before the claim has taken form'") (quoting *Motisola Malikha Abdallah v. Coca–Cola Co.,* 1999 WL 527835, at *1 (N.D. Ga. July 16, 1999)). "Further, Plaintiff is entitled to plead in the alternative[,]" *Desmond*, 2015 WL 845571, at *2 (S.D. Fla. Feb. 25, 2015), and elect remedies at a later stage of litigation.

Finally, Defendants' argument that Plaintiffs' request for declaratory relief does not "correspond" to injunctive relief fails as well. *See* Motion at 35. The "correspondence" requirement simply mandates that the declaration sought be equivalent to an injunction. *See, e.g., Christ v. Beneficial Corp.*, 547 F.3d 1292, 1298 n.11 (11th Cir. 2008) (declaration sought must "as a practical matter afford[s] injunctive relief or serve[s] as a basis for later injunctive relief"); Wright & Miller, 7AA FED. PRAC. & PROC. CIV. § 1775 (3d ed.) ("In other words, the declaration should be equivalent to an injunction. . . . [T]he rule does not require that both forms of relief be sought and a class action seeking solely declaratory relief may be certified under subdivision (b)(2)."). Plaintiffs here seek a declaration that would enjoin Defendants from denying them and class members coverage. *See* FAC ¶¶ 78, 79.

The Court should not find that it would be impossible to certify a Rule 23(b)(2) class at this early stage of litigation.

## C.  The FAC Does Not Reflect the Predominance of Individual Issues on Its Face.

Finally, Defendants argue that the Court cannot certify a Rule 23(b)(3) class because different state laws will apply to different class members' claims. *See* Motion at 37-38. Once again, Defendants' argument is exceedingly premature. Plaintiffs will submit a trial plan addressing any variations in different states' laws with their motion for class certification. To the extent that those variations prove to be immaterial, a class action will be manageable and the Court may certify a

39

nationwide or multistate class. *See, e.g., Klay v. Humana, Inc.*, 382 F.3d 1241, 1262 (11th Cir. 2004) ("[I]f the applicable state laws can be sorted into a small number of groups, each containing materially identical legal standards, then certification of subclasses embracing each of the dominant legal standards can be appropriate."); *In re Checking Account Overdraft Litig.*, No. 1:09-MD-02036-JLK, 2012 WL 12877717, at *17 (S.D. Fla. July 19, 2012) ("Complete uniformity of state law is not required as long as there are no material conflicts among the laws."). And even if a multistate class action proves unmanageable based on state law variations, the Court may still certify a Florida class. *See, e.g., Williams*, 280 F.R.D. at 675 (certifying a Florida class in case where plaintiffs had originally defined nationwide class). In any event, it would be premature to dismiss Plaintiffs' nationwide class allegations based on potential differences in the law before Plaintiffs have ascertained what states' laws are at issue, and when it is not yet clear that any variances would be material. *See, e.g., James D. Hinson Elec. Contracting Co. v. AT & T Servs., Inc.*, No. 3:13-CV-29-J-32JRK, 2014 WL 1118015, at *4 (M.D. Fla. Mar. 20, 2014) (striking class allegations premature where "[t]he Court cannot yet predict whether the identified differences in state laws on, for instance, the level of fault required to prove a claim for unjust enrichment, the voluntary payment affirmative defense, or the statutes of limitations will present an insurmountable obstacle to certifying a multistate class or subclasses").

The Court should not dismiss Plaintiffs' class allegations.

## CONCLUSION

The Court should deny Defendants' Motion to Dismiss.

## REQUEST FOR HEARING

Plaintiffs request a hearing on Defendants' Motion to Dismiss. Plaintiffs believe a hearing is warranted due to the importance of the issues presented to insureds nationwide, and because this case and Defendants' motion present complex insurance coverage issues. A hearing will assist the

Court in resolving these complex issues.  Plaintiffs estimate that approximately one hour will be required for argument.

Respectfully submitted August 17, 2020.

> **KOZYAK TROPIN & THROCKMORTON LLP**
> 2525 Ponce de Leon Blvd., 9th Floor
> Coral Gables, FL 33134
> Tel: (305) 372-1800
>
> By: */s/ Harley S. Tropin*
>    Harley S. Tropin, Esq.
>    Florida Bar No. 241253
>    hst@kttlaw.com
>    Benjamin Widlanski, Esq.
>    Florida Bar No.  1010644
>    bwidlanski@kttlaw.com
>    Gail A. McQuilkin, Esq.
>    Florida Bar No. 969338
>    gam@kttlaw.com
>    Javier A. Lopez, Esq.
>    Florida Bar No. 16727
>    jal@kttlaw.com
>    Rachel Sullivan, Esq.
>    Florida Bar No. 815640
>    rs@kttlaw.com
>    Robert Neary, Esq.
>    Florida Bar No. 81712
>    rn@kttlaw.com
>    Frank A. Florio, Esq.
>    Florida Bar No. 1010461
>    fflorio@kttlaw.com
>
>    *Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 17, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By:  /s/ *Harley S. Tropin*

42